IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TROY M. HURD, | ) | |
| | ) | |
| Plaintiff, | ) | 4:16CV3029 |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF LINCOLN, a political | ) | **MEMORANDUM** |
| subdivision, TOM CASADY, in their | ) | **AND ORDER** |
| individual and official capacities, | ) | |
| JOHN HUFF, in their individual and | ) | |
| official capacities, PAT BORER, in | ) | |
| their individual and official | ) | |
| capacities, ROGER BONIN, in their | ) | |
| individual and official capacities, | ) | |
| JEANNE PASHALEK, in their | ) | |
| individual and official capacities, and | ) | |
| LEO BENES, in their individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Troy Hurd brings claims under 42 U.S.C. § 1983, Title VII[1], and the Nebraska Fair Employment Practice Act[2] alleging that his employer, the City of Lincoln ("City"), and various City employees affiliated with Lincoln Fire and Rescue retaliated against him after he witnessed, and then complained about, sexual and national-origin harassment of a fellow employee. Hurd claims that the City retaliated against him by creating a hostile work environment because he complained about the harassment and because he filed charges with the NEOC/EEOC. Defendants have moved for summary judgment on all of Plaintiff's claims. (Filing No. 107.) For the

---

[1]Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (Westlaw 2018).

[2]Neb. Rev. Stat. §§ 48-1101 to 48-1125 (Westlaw 2018).

reasons that follow, the Motion shall be granted in part and denied in part.

## I.  UNDISPUTED MATERIAL FACTS[3]

### Plaintiff and Defendants

1.     The City of Lincoln is a political subdivision, primary-class city, and municipal corporation of the State of Nebraska that provides fire-suppression services through individuals employed at the Lincoln Fire and Rescue Department ("LF&R"). (Aff. Golden, Filing No. 108-1 at CM/ECF p. 1 ¶ 3.)

2.     Defendant Tom Casady ("Casady") is the Director of Public Safety for the City of Lincoln, which involves oversight over LF&R and the Lincoln Police

---

[3] The parties' 345 pages of briefing contains 366 paragraphs of "facts," almost all of which are objected to by the opposing party, often in a cursory fashion. The Undisputed Material Facts appearing in this Memorandum and Order are those that are relevant, material, not genuinely disputed, and can be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56. Many of the Plaintiff's and Defendants' statements of fact have been "merged" to provide a complete picture of the various incidents at issue here. In addition to facts omitted for reasons discussed in footnotes accompanying the court's Undisputed Material Facts, the court has not considered statements of fact that required the court to make credibility determinations or determine the truth of any factual issue; were cumulative or lacked foundation; or were not supported by the cited evidence. To the extent Plaintiff's proposed statements of fact cite and rely upon his uncorroborated beliefs in his affidavit, they have not been considered. *de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002) (plaintiff's belief that defendants behaved vindictively, without evidence to support such assertion, "ha[s] no effect and do[es] not create a genuine issue of material fact that would preclude summary judgment") (internal quotation and citation omitted); *Policky v. City of Seward, Neb.*, 433 F. Supp. 2d 1013, 1016 n.2 (D. Neb. 2006) ("[M]ere statement[s] of belief do[] not create a genuine issue of material fact.") Further, evidence regarding the Amanda Benson and Brian Giles cases has not been considered because that evidence is irrelevant to Plaintiff's claims.

Department. (Aff. Casady, Filing No. 108-2 at CM/ECF p. 1 ¶¶ 2-3.)

3.      Defendant John Huff ("Huff") is a retired LF&R Chief for the City of Lincoln, a position he held from April 2011 to June 2015. (Aff. Huff, Filing No. 108-3 at CM/ECF p. 1 ¶ 2.)

4.      Defendant Pat Borer ("Borer") is the LF&R Assistant Chief for the City of Lincoln. (Aff. Borer, Filing No. 108-4 at CM/ECF p. 1 ¶ 2.)

5.      Defendant Jeanne Pashalek ("Pashalek") is a retired LF&R Battalion Chief for the City of Lincoln whose position involved serving as the Human Resources Officer at LF&R until her retirement in August 2015. (Aff. Pashalek, Filing No. 108-5 at CM/ECF pp. 1-2 ¶¶ 2, 7.)

6.      Defendant Roger Bonin ("Bonin") was the LF&R Division Chief of Training for the City of Lincoln from 2011 to August 2016. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 1 ¶ 2.)

7.      Defendant Leo Benes ("Benes") is a LF&R Battalion Chief for the City of Lincoln who was not in charge of the recruit training academy in the fall of 2011 when it began, but later performed such duties. (Aff. Benes, Filing No. 108-7 at CM/ECF p. 1 ¶ 2.)

8.      In April 2011, Huff was appointed Interim Fire Chief. Around that time, he instituted a flat organizational structure for LF&R management that streamlined the hierarchy and put six Battalion Chiefs, two Division Chiefs, and one Assistant Chief in charge of various engine and truck companies at 14 different fire stations spread across the City of Lincoln. As part of that restructuring, Bonin took charge of Emergency Medical Services ("EMS") in addition to the Training Division. (Bonin Dep., Filing No. 134-7 at 14:21-17:18.) As Interim Fire Chief, Huff was "ultimately . . . responsible" for disciplining LF&R personnel. (Aff. Huff, Filing No. 108-3 at

CM/ECF pp. 1 ¶ 3 & Ex. A; Huff Dep., Filing No. 134-6 at 45:12-20.)

9.      Plaintiff Troy Hurd ("Hurd") is a resident of Lincoln, Lancaster County, Nebraska. The City of Lincoln hired Hurd in November 2000 as a LF&R Firefighter/Paramedic. In August 2009, Hurd was promoted to his current role, Fire Captain Paramedic. (Hurd Dep., Filing No. 115-8 at 41:24-42:3; Filing No. 18 at CM/ECF pp. 1-2 ¶¶ 2, 11.) When Hurd was promoted to Captain, he was assigned to the Training Division under Danny Wright, the Division Chief of Training for LF&R at the time. (Hurd Dep., Filing No. 115-8 at 41:24-42:3, 45:2-11, 49:5-14, 64:15-67:6, 70:11-14.) In 2011, Wright retired. Hurd applied for the Division Chief of Training Position, but Roger Bonin got the position instead, and Bonin became Hurd's direct supervisor in the Training Division. (Hurd Dep., Filing No. 115-8 at 25:21-26:21, 70:11-71:4, 107:4-108:1 & Exs. 182, 183; Bonin Dep., Filing No. 114-10 at 14:21-15:6, 22:25-25:2, 27:12-28:13.)

## LF&R Recruit Training Academy in Fall 2011

10.     At the time of his promotion to Fire Captain on July 13, 2009, Hurd was required to sign an agreement to serve in the Training Division of LF&R for three years. (Aff. Golden, Filing No. 108-1 ¶ 17; Filing No. 108-15; Filing No. 21 at CM/ECF p. 2 ¶ 6.)

11.     Hurd was assigned to the Training Division as a Captain in the fall of 2011, where he joined Firefighter Lloyd "Eddie" Mueller ("Mueller") in the recruit training academy beginning on or about September 7, 2011. Mueller was the lead instructor of the recruit academy, and Hurd agreed to assist and follow Mueller's plan of action in the academy because Mueller had been in charge of three other recruit academies before Hurd's assignment. This was the first and only recruit academy in which Hurd was a primary instructor; however, Hurd taught multiple classes throughout his time at the recruit academy. Dallas Fletcher also assisted with the same recruit academy. (Aff. Benes, Filing No. 108-7 at CM/ECF pp. 1-2 ¶¶ 3-4; Aff.

Mueller, Filing No. <u>108-13 at CM/ECF pp. 1</u>-2 ¶¶ 3-4; Aff. Bonin, Filing No. <u>108-6</u> <u>at CM/ECF pp. 1</u>-2  ¶ 5; Filing No. <u>18 at CM/ECF p. 2</u> ¶ 12; Hurd Dep., Filing No. <u>134-12</u> at 110:7-111:11, 115:23-117:5; Bonin Dep., Filing No. <u>134-7</u> at 45:22-46:13, 47:20-48:8.)

12.   Mueller and Hurd previously operated a construction company together with another non-LF&R firefighter that was called "Rock Hard Construction," but the company dissolved before the recruit academy began. (Aff. Benes, Filing No. <u>108-7</u> <u>at CM/ECF p. 2</u> ¶ 5; Aff. Kant, Filing No. <u>108-11 at CM/ECF pp. 1</u>-2 ¶ 3; Aff. Mueller, Filing No. <u>108-13 at CM/ECF p. 2</u> ¶ 5.)

13.   The fall of 2011 recruit class was a large class of 17 individuals, so it was broken into three groups, with each instructor training a group. (Aff. Mueller, Filing No. <u>108-13 at CM/ECF p. 2</u> ¶ 6.) One of the recruits in the 2011 training class was Sara Khalil, who is female and of Middle-Eastern descent. (Taylor-Riley Report, Filing No. <u>135-1 at p. 7</u>.)

14.   Mueller and Hurd did not agree on the methods used to train the recruits in the fall of 2011. (Aff. Mueller, Filing No. <u>108-13, at CM/ECF p. 2</u> ¶ 6; Aff. Benes, Filing No. <u>108-7 at CM/ECF p. 2</u> ¶ 7.)

15.   During the recruit class, Hurd repeatedly witnessed what he perceived to be harassment of and discrimination against Khalil. Mueller referred to Khalil as the "golden child." After Mueller taught Khalil how to tie a knot, he intentionally tied the knot in a different way when presenting it to the class, causing Khalil to question Mueller on the differences. Hurd overheard Mueller tell Khalil to "[g]o sit the fuck down!" after Khalil asked him about the difference between the two knots. Hurd also witnessed Mueller become frustrated with Khalil and heard his voice get louder

5

whenever Khalil asked a question.[4] (Hurd Dep., Filing No. 134-12 at 125:2-133:9; Taylor-Riley Dep., Filing No. 134-1 at 69:3-70:6.)

16.    A month into the recruit training class, Jamie Pospisil, a Captain in charge of Paramedic training, asked Khalil, "do you need a fucking interpreter?" while Khalil was wearing a breathing apparatus. Khalil reported this comment to Hurd. (Hurd Dep., Filing No. 134-12 at 166:9-167:18, 209:25-211:4; Bonin Dep., Filing No. 134-7 at 42:21-44:20.) Bonin later learned about Pospisil's comment when Pospisil admitted to Bonin that she said it.[5] By affidavit, Pospisil denies making the remark. (Bonin Dep., Filing No. 134-7 at 42:21-44:20; Aff. Pospisil, Filing No. 108-14 at CM/ECF p. 2 ¶ 12.)

17.    Khalil's first two Preceptors were Nancy Crist and Tony Hewitt. (Borer Dep., Filing No. 134-9 at 96:14-102:19.) Khalil reported to Hurd that Hewitt told her to "Go back to Iraq!" (Hurd Dep., Filing No. 134-12 at 166:14-167:4; Taylor-Riley Dep., Filing No. 134-1 at 154:1-155:1 & Filing No. 134-4 at Ex. 100.)

18.    Khalil complained to Hurd and Fire Captain Brian Giles about being singled out and treated differently by Mueller, but she did not make any direct complaints to Benes, Mueller, Pospisil, or Pashalek that she was experiencing discrimination at LF&R based on her national origin or gender. Hurd interpreted

---

[4]Mueller's (and other LF&R employees') statements are not hearsay because they are "offered against an opposing party and . . . [were] made by the [City of Lincoln's] . . . employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

[5]Following the completion of a recruit class, new Firefighters/Paramedics get field training through a process called "precepting." The recruits become what LF&R refers to as Probationary Firefighters, and they are assigned a Preceptor to monitor their performance in the field. (Borer Dep., Filing No. 134-9 at 31:20-32:24; Huff Dep., Filing No. 134-6 at 70:4-11.)

Khalil's complaints to him to be complaints of discrimination based on sex. Hurd reported to his supervisor, Roger Bonin, and to Jeanne Pashalek, John Huff, Patrick Borer, and Pat Kant that Mueller was training the recruits in a paramilitaristic style; what he perceived to be discrimination against and harassment of Sara Khalil during her preceptorship; and the discrimination, harassment, and retaliation he felt he was experiencing. The dates of these communications are unclear. (Bonin Dep., Filing No. 134-7 at 19:1-23:1, 35:6-15, 37:1-45:6, 51:7-52:21, 60:20-61:7; Borer Dep., Filing No. 134-9 at 74:3-7, 75:18-82:14, 83:8-16, 84:20-85:12; Pashalek Dep., Filing No. 134-11 at 50:8-53:21, 97:17-105:8 & Ex. 163; Aff. Benes, Filing No. 108-7 at CM/ECF p. 2 ¶¶ 6-7, 12; Aff. Bonin, Filing No. 108-6 at CM/ECF p. 2 ¶ 6 & Ex. B; Filing No. 21 at CM/ECF p. 2 ¶ 6; Aff. Mueller, Filing No. 108-13 at CM/ECF p. 2 ¶ 10; Aff. Pospisil, Filing No. 108-14 at CM/ECF p. 3 ¶ 13; Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 3 ¶ 12; Hurd Dep., Filing No. 134-12 at 133:15-134:1, 134:19-136:12, 137:21-138:14, 154:10-13, 157:1-169:20, 180:2-181:22; Huff Dep., Filing No. 134-6 at 64:11-68:7; Linke Dep., Filing No. 134-10 at 116:11-117:13.)

19.     Bonin reported Hurd's complaints to Richard Furasek, who was Bonin's supervisor at the time, and to Leo Benes, a Battalion Chief for LF&R and Mueller's supervisor. (Bonin Dep., Filing No. 134-7 at 20:16-23:1, 38:22-40:1, 49:4-21.) In November 2011, Bonin told Hurd that because Mueller was not his direct report, Bonin's hands were tied regarding Mueller's conduct towards Khalil.  (Hurd Dep., Filing No. 134-12 at 148:8-14.)

20.     Mueller claims he met with Battalion Chief Benes, his direct supervisor, regarding incidents during the recruit academy in which he thought Hurd's conduct was unsafe or Hurd did not follow through on lessons. Chief Benes did not address any of these alleged performance concerns with Hurd's conduct until after Hurd complained in January of 2012 about discrimination and harassment directed toward Khalil. (Hurd Dep., Filing No. 134-12 at 178:6-180:11; Aff. Benes, Filing No. 108-7, at CM/ECF p. 2 ¶ 7; Aff. Mueller, Filing No. 108-13 at CM/ECF p. 2 ¶ 7.)

21.   On October 10, 2011, Hurd received a written reprimand for a criminal conviction on September 28, 2011, for assaulting his wife in June 2011.[6] Bonin had reported Hurd to the Nebraska Department of Health and Human Services, as required by the State's mandatory reporting act.  (Aff. Huff, Filing No. 108-3 at Ex. D; Aff. Casady, Filing No. 108-2 at CM/ECF p. 2 ¶ 9; Aff. Bonin, Filing No. 108-6 at CM/ECF p. 2 ¶ 9; Aff. Kruger, Filing No. 108-12 at CM/ECF pp. 1 ¶ 3 & Ex. A.)

22.   On October 11, 2011, Mueller received an Employee Incident Report ("EIR") from Benes for using offensive language during the recruit training academy. The EIR directed Mueller to "maintain better control of himself and his mastery of the English language. . . [and to] manage effectively and in a manner to create good order inside the department." (Aff. Benes, Filing No. 108-7 at CM/ECF pp. 2 ¶ 6 & Ex. A.)

23.   Benes did not remove Mueller from the recruit academy, but did remove Hurd from the academy. (Hurd Dep., Filing No. 134-12 at 142:11-20, 152:10-154:25; Bonin Dep., Filing No. 134-7 at 48:9-49:3.) Benes did not conduct an investigation into Mueller's conduct, nor did he tell Khalil that Mueller's conduct was inappropriate or that he had attempted to rectify the situation by giving Mueller an EIR. After Hurd was removed from the recruit academy, he complained to Bonin about his removal. (Hurd Dep., Filing No. 134-12 at 155:9-23.)

24.   Although the date is unclear from the cited evidence, at some point Hurd

---

[6]Hurd objects to the inclusion of this fact based on relevance and Fed. R. Evid. 403 and 404(a)(1). This fact may be relevant depending on the date Hurd first reported the discrimination and harassment against Kahlil. Hurd claims he was disciplined only *after* complaining about the discrimination and harassment of Khalil; however, if Hurd reported the discrimination and harassment after October 10, 2011, this fact shows that Hurd received discipline *before* his discrimination/harassment complaints began. The court does not consider this fact as evidence of Hurd's character; rather, it is considered only with regard to the timing of the discipline to which Hurd was subject.

was reassigned to other duties within the Training Division. (Aff. Benes, Filing No. 108-7 at CM/ECF p. 2 ¶ 8; Aff. Mueller, Filing No. 108-13 at CM/ECF p. 2 ¶ 7; Aff. Bonin, Filing No. 108-6 at CM/ECF p. 2 ¶ 7.)

25.   In November 2011, the recruit academy ended, and the Firefighter/Paramedics went on to be trained and rated by Preceptors for several months beginning approximately in December 2011. (Aff. Pospisil, Filing No. 108-14 at CM/ECF p. 3 ¶ 15.)

26.   On or about January 17, 2012, Hurd met with Bonin and Pashalek regarding his complaints about the recruit academy and Mueller. His complaints involved rumors he believed Mueller was spreading about him within LF&R, as well as how Mueller, as the lead instructor, handled the recruit training academy. Hurd's main concern in meeting with Pashalek in January 2012 was the discrimination and harassment of Sara Khalil during the training academy, and Hurd claims that he complained to Pashalek and Bonin at that time about the treatment of the recruits and the harassment and discrimination of Khalil based on her sex and national origin. (Pashalek Dep., Filing No. 134-11 at 50:8-53:21, 83:8-16, 84:20-85:12; Hurd Dep., Filing No. 134-12 at 161:2-169:20; Bonin Dep., Filing No. 134-7 at 51:7-21; Taylor-Riley Dep. Ex., Filing No. 114-4 at CM/ECF p. 36 (Ex. 40).) However, Pashalek claims she understood Hurd's verbal and written statements to be about Mueller and the recruit academy generally, not that any recruit was treated differently because of his or her protected status. (Aff. Pashalek, Filing No. 108-5 at CM/ECF pp. 2-3 ¶ 10 & Ex. B.)

27.   After the January 17, 2012, meeting, Hurd made a formal written complaint to Pashalek regarding the discrimination he claims to have witnessed in the recruit academy. (Taylor-Riley Dep. Ex., Filing No. 114-4, Ex. 40 at p. 4; Hurd Dep., Filing No. 134-12 at 161:2-169:20; Bonin Dep., Filing No. 134-7 at 51:7-21.) In his written statement to Pashalek, Hurd stated:

Fire recruit Sara Kahlil was asking Firefighter Mueller a question regarding a topic while he was sitting in the chair in front of the classroom. I was in the rear office completing paperwork with the door open and less than 5 feet away. This was prior to 0700 hours. Firefighter Mueller was not pleased with the question she asked about a problem because she did not understand it and he stated to her (go sit the fuck down).

(Taylor-Riley Dep., Filing No. 114-4, Ex. 40 at p. 4 (parenthetical included in original).)

28.    In her role as the Human Resources Officer of LF&R, Pashalek conducted an investigation after the January 17, 2012, meeting. Pashalek did not interview Khalil as part of the investigation, but she did interview Mueller and some male members of the recruit academy. Pashalek's transcribed investigation notes were placed in Hurd's personnel file, but not in Mueller's file. (Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 3 ¶ 11 & Ex. B; Aff. Bonin, Filing No. 108-6 at CM/ECF p. 2 ¶ 10; Pashalek Dep., Filing No. 134-11 at 34:13-35:6, 50:8-64:12; Taylor-Riley Dep. Exs., Filing No. 114-2 at Ex. 5, Filing No. 114-4 at Ex. 45.)

29.    Based on her investigation, Pashalek believed that the root of the problem was a personal conflict between Mueller and Hurd. Pashalek arranged for a face-to-face "mediation" meeting between the two, to be attended by members of command staff, to address the conflict. (Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 3 ¶ 13 & Exs. B, C.) LF&R's mediation process involves having an independent person present who hasn't "picked a side" and who acts as a go-between to hear each side of the story. (Bonin Dep., Filing No. 134-7 at 54:1-55:10.) The mediation process is voluntary. (Pashalek Dep., Filing No. 134-11 at 73:19-74:15; Borer Dep., Filing No. 134-9 at 89:6-9.)

30.    On or about January 30, 2012, a mediation meeting was held with Hurd, Pashalek, Borer, Benes, Fletcher, and Mueller in order to resolve the issues between

Hurd and Mueller. Hurd's request that his supervisor, Bonin, be present was denied. (Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 3 ¶ 14; Aff. Mueller, Filing No. 108-13 at CM/ECF p. 2 ¶ 12; Aff. Borer, Filing No. 108-4 at CM/ECF p. 1 ¶ 3; Aff. Benes, Filing No. 108-7 at CM/ECF pp. 2-3 ¶ 10; Filing No. 21 at CM/ECF pp. 2-3 ¶ 9; Bonin Dep., Filing No. 114-10 at 51:7-53:5.) Borer mediated the meeting, and the remaining attendees were people Hurd had either complained to or about regarding the discrimination and harassment of Khalil. (Hurd Dep., Filing No. 134-12 at 169:21-183:2; Borer Dep., Filing No. 134-9 at 83:9-90:17; Pashalek Dep., Filing No. 134-11 at 71:17-72:3.)

31.    Hurd attempted to talk about Mueller's discrimination and harassment of Khalil, but Borer interrupted him and said that because Pashalek did not find anything in her investigation, they would not address Hurd's complaints of discrimination and harassment based on sex and national origin. (Hurd Dep., Filing No. 134-12 at 180:12-181:5.) At no time during this meeting did Hurd say that Mueller was mistreating any recruit based on his or her gender or national origin. The meeting did reveal the conflict between Mueller and Hurd and the history of their business together.[7] (Aff. Benes, Filing No. 108-7, at CM/ECF p. 2 ¶ 10 & Ex. B; Aff. Mueller, Filing No. 108-13 at CM/ECF pp. 2-3 ¶ 12; Aff. Pashalek, Filing No. 108-5 at CM/ECF pp. 3-4 ¶¶ 13-15; Aff. Borer, Filing No. 108-4 at CM/ECF p. 1-2 ¶ 4.)

32.    At some point during the meeting, Hurd said he was finished with the meeting and was not going to proceed.[8] (Aff. Benes, Filing No. 108-7 at CM/ECF p. 2 ¶ 10; Aff. Mueller, Filing No. 108-13 at CM/ECF p. 3 ¶ 12; Aff. Borer, Filing No.

---

[7] Hurd "denies" this statement of fact, but his "response" does not contradict any part of the stated facts. Rather, Hurd describes his thoughts and suspicions about the real purpose of the meeting and the scheduling thereof. (Filing No. 113 at CM/ECF p. 23.)

[8] Again, Hurd "denies" this statement of fact, but his "response" does not contradict any part of the stated facts. (Filing No. 113 at CM/ECF p. 24.)

108-4 at CM/ECF p. 2 ¶ 5; Filing No. 21 at CM/ECF p. 3 ¶ 10.)

33.    Pashalek viewed Hurd's conduct during the meeting as unbecoming of a supervisory officer of LF&R because she felt he was emotional, irrational, defensive, and uncooperative. Hurd eventually left before the end of the meeting, stating it was a "waste of time."[9] Hurd disagrees that he was the first person to leave the meeting, as Fletcher and Mueller both reported to Pashalek that they left the meeting before Hurd.  (Pashalek Dep., Filing No. 134-11 at 87:5-88:20 & Filing No. 115-6 at CM/ECF p. 1 (Ex. 156); Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 3 ¶ 14.)

34.    Because of Hurd's perceived behavior during the meeting, Hurd received a written reprimand initiated by Pashalek for insubordination for leaving the meeting early.[10] The reprimand was signed by Pashalek on February 28, 2012, and signed by Hurd indicating receipt on March 1, 2012. (Aff. Pashalek, Filing No. 108-5 at CM/ECF pp. 3-4 ¶ 15 & Ex. D; Filing No. 21 at CM/ECF p. 3 ¶ 11.)

35.    After Fire Chief Huff's "consideration and deliberation regarding [her] performance, and [her] failure to meet Lincoln Fire & Rescue department expectations," Khalil was terminated by LF&R on February 29, 2012. (Filing No. 108-3 at CM/ECF p. 6 (Termination Letter).)

_____

[9]Hurd states that he "denies" this statement of fact with no further discussion, except to direct the court to his lengthy, single-spaced, and citation-filled responses to prior statements of fact and to a deposition. It is not the court's function to glean a plaintiff's objections from a list of citations with no explanation. (Filing No. 113 at CM/ECF p. 24.)

[10]Hurd states that he "denies" this statement of fact with no further discussion, except to direct the court to his lengthy, single-spaced, and citation-filled responses to prior statements of fact and to a deposition. It is not the court's function to glean a plaintiff's objections from a list of citations with no explanation. (Filing No. 113 at CM/ECF p. 24.)

36.     On March 2, 2012,  Hurd met with Chief John Huff, Dave Engler of the LF&R Union, and Pat Kant, then the Human Resources Coordinator for the City of Lincoln, due to the written reprimand Hurd received after the January 2012 meeting. Hurd continued to reiterate his irritation at how Mueller ran the recruit academy. (Aff. Huff, Filing No. 108-3, at CM/ECF p. 2 ¶¶ 6-7; Aff. Kant, Filing No. 108-11 at CM/ECF pp. 1-2 ¶ 3; Filing No. 21 at CM/ECF p. 3 ¶ 13.)

37.     Chief Huff ultimately declined to withdraw the reprimand. (Aff. Huff, Filing No. 108-3 at CM/ECF pp. 2 ¶ 8 & Ex. C; Filing No. 21 at CM/ECF p. 3 ¶ 14.)

38.     Hurd submitted a request to be removed from the Training Division before the end of his three-year contract, which was granted. Hurd claims he asked to be transferred in mid-January prior to the mediation meeting. The Defendants differ as to when the transfer became effective—some claim it was on or about March 29, 2012, and others claim it was in April 2012. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 3 ¶ 13; Aff. Borer, Filing No. 108-4 at CM/ECF p. 2 ¶ 6; Filing No. 21 at CM/ECF pp. 2 ¶ 6; Hurd Dep., Filing No. 115-8 at 201:7-20.)

## LF&R Survey Regarding Discrimination and Harassment

39.     On August 2, 2012, Hurd responded to a voluntary survey circulated by the City of Lincoln regarding workplace discrimination and harassment. Approximately 71 employees responded to some portion of the survey. In Hurd's response, he complained about the discrimination and harassment of Khalil, how he felt the investigation into her discrimination and harassment was mishandled by LF&R command staff, and about the unfairness of Khalil's termination. (Hurd Dep., Filing No. 134-12 at 262:24-265:6, 281:25-283:23 & Filing No. 115-9 at Ex. 191; Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7.)

40.     In response to a survey question asking if the respondent had observed or was the target of discrimination or harassment, Bryan Kratochvil, who worked at

the same station as Khalil, stated that he had reported Khalil's mistreatment to his Captain three times. Kratochvil's survey responses were entered on August 27, 2012. (Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7 pp. 10-11.)

41.    Pashalek wrote in response to a survey question seeking general comments about discriminatory or harassing activities within LF&R:

> I believe there are subtle occurrences on a daily basis ranging from ignoring others, comments or jokes, to actual isolation in some cases. Our middle managers really need training on EEO since they are the front line managers in the stations. The training must also be for all personnel, but starting with the captains is the front line "defense."

(Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7 p. 8.)

42.    In response to another survey question—"[h]ow can LF&R make improvements in matters of discrimination or sexual harassment?"—Pashalek stated:

> The first step is awareness, followed by education and training, and lastly is the accountability with zero tolerance. Last year we had training due to a grant, but it had been years before that. Our department is a white male dominated culture that believes they treat people fairly, but women are subjected to a lot of subtle harassment/discrimination. The women are too concerned about getting along and not being considered a trouble maker by their peers so they will not report issues. I hear about them and I know of several of our women have or currently are experiencing issues. Having a confidential process for reporting will be a huge improvement. We should contract with Cultural Bridges to Justice for training starting next year. If we get multiple agencies to split the cost it will be affordable and well worth it.

(Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7 p. 21.)

43.    Pashalek's survey response was entered on August 2, 2012. (Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7 pp. 8, 21, 33.)

14

44.     Bruce Sellon, a Battalion Chief for LF&R at the time, responded to a survey question regarding whether he would like to discuss discrimination and harassment with LF&R's EEO Officer or the Director of Equity and Diversity by stating, "I don't know. Retaliation can be a factor." Sellon's responses were entered on August 14, 2012. (Taylor-Riley Dep. Ex., Filing No. 114-2 at Ex. 7 pp. 17, 32.)

## Internal Investigation

45.     In her role as the Director of Equity and Diversity for the City of Lincoln, Taylor-Riley is charged with performing unbiased, thorough, and timely internal investigations regarding EEO Complaints. (Taylor-Riley Dep., Filing No. 114-1 at 14:22-15:12, 185:7-13 & Filing No. 114-5 at Ex. 78.) Following Hurd's responses to the above-described survey, Taylor-Riley began an investigation into whether Khalil was discriminated against by LF&R personnel and whether Hurd was discriminated or retaliated against for his complaint of discrimination and harassment based on sex and national origin regarding Khalil. (Taylor-Riley Dep., Filing No. 114-1 at 46:18-49:18 & Ex. 5 (Internal Investigation Dispositional Memorandum).)

46.     Taylor-Riley maintained her investigative notes and file regarding Hurd in the normal ordinary course of business, produced her notes contemporaneously with her conversations with the witnesses she interviewed or shortly thereafter, and produced an official report for review by Mayor Beutler regarding the Hurd investigation. (Taylor-Riley Dep., Filing No. 114-1 at 43:7-56:7.)

## Suspension of Investigation

47.     On May 10, 2013, Taylor-Riley was instructed to "hold off" on the investigation into Hurd's complaint because Hurd filed a Charge of Discrimination with the NEOC/EEOC, even though the NEOC had already reached a determination in Hurd's case. (Taylor-Riley Dep., Filing No. 114-5 at Ex. 76; Filing No. 108-17.) The process for the City's internal investigation after a person files a NEOC/EEOC

Charge is for the Mayor's Office to decide if Taylor-Riley can continue her investigation while the NEOC/EEOC is investigating. Taylor-Riley's investigation was shelved for approximately four to six months. (Taylor-Riley Dep., Filing No. 114-1 at 117:21-120:1, 126:2-9 & Filing No. 114-5 at Ex. 76.)

48.     When Taylor-Riley informed Hurd that the investigation was being suspended, he stated to her in an email dated May 20, 2013:

> [T]hings are not any better and actually things continue to get worse at work. There is no accountability of the Chief officers and I have realized that filling out the EEO form online has truly ruined my career. Being honest and coming forward with large amounts of information an [sic] actually finding the truth of what happened was really not worth saying a word.
>
> These Chiefs are continually being bolder and braver then [sic] ever before with their actions and they are untouchable. The same people involved are back doing the same things as before. I realized your hands are tied also. I have basically given up. I was told by a Chief that he couldn't wait to receive your report saying that there was nothing found[] so they (white shirts) could move forward of actually working on true fire department business instead of false complaints.

(Aff. Hurd Ex., Filing No. 116-6 (Ex. E).)

### Paramedic Certification and RSI Procedures

49.     In 2009, Hurd was certified to perform the rapid sequence intubation ("RSI") procedure. The procedure involves sedating and paralyzing a patient in order to place a breathing tube down the windpipe. When Hurd was assigned to the Training Division, he did not have the opportunity to actively perform RSI procedures for LF&R because he was not on emergency calls, but he still had Paramedic duties. He did, however, teach other LF&R employees how to perform the RSI procedure as part of his assignment to the Training Division. While Hurd was assigned to the Training

16

Division for LF&R in 2009-2010, Hurd continued to go on emergency calls and perform RSI procedures on individuals through his work at Southwest Rural Fire & Rescue. (Hurd Dep., Filing No. 134-12 at 51:19-55:11, 228:17-230:23.)

50.     After Hurd's assignment to the Training Division for over two and a half years,  Hurd was required to be re-certified as a system-certified Paramedic. Hurd was re-certified on or about April 22, 2012. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 3 ¶ 14 & Ex. C; Aff. Hurd, Filing No. 116-1 ¶ 9.)

51.     In April 2012, Hurd completed RSI procedures on two different patients. The first patient was a young female who had overdosed. Hurd was the first Captain Paramedic on the site. The female wasn't breathing, so Hurd and Craig Clark, a Fire Captain Paramedic, attempted to protect her airway by performing an RSI procedure while en route to the hospital. Because LF&R procedures required two Paramedics to assist when an RSI procedure was performed, Hurd was serving as the second Paramedic to the procedure. The procedure was performed without incident, and the patient was transported to the hospital with full vitals, but she remained unconscious. The female patient later died at the hospital from organ failure, unrelated to the RSI procedure. (Hurd Dep., Filing No. 134-12 at 52:5-54:5; Aff. Kruger, Filing No. 108-12 at CM/ECF p. 1 ¶¶ 4-5 & Ex. B; Aff. Hurd, Filing No. 116-1 ¶ 11.)

52.     On April 24, 2012, Hurd was involved in another critical call involving a 40-year-old man who had a heart attack and stopped breathing. Andrew Silcox, a Paramedic, and Eppens, the EMS Supervisor, performed an RSI procedure to secure the patient's airway. The patient was very combative. Silcox and Eppens attempted to intubate the patient while Hurd administered the sedation drugs and paralytics. Neither Eppens nor Silcox could secure the patient's airway, and they had to manually "bag" the patient on the way to the hospital. The patient ended up making a full recovery. (Aff. Hurd, Filing No. 116-1, CM/ECF p. 4 ¶ 13.)

53.     On April 26, 2012, Hurd's RSI Privileges were suspended pending an

investigation into the two incidents. No other LF&R employee had their RSI privileges suspended as a result of the two incidents, including Clark or Eppens. In June 2012, Bonin determined that Hurd would not be allowed to perform RSI procedures anymore. Hurd's RSI credentials at LF&R have not been reinstated to date. (Hurd Dep., Filing No. 134-12 at 55:12-60:25 & Filing No. 115-9 at Exs. 184, 185; Aff. Bonin, Filing No. 108-6, at CM/ECF pp. 3 & Ex. E.)

54.     Bonin has suspended other LF&R employees' RSI privileges, both before and after Hurd's suspension. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 3 ¶ 15.)

## EMS Supervisor Positions

55.     EMS Supervisors are Fire Captains that run the day-to-day EMS operations. They are required to respond to all cardiac arrests, and LF&R requires at least one EMS Supervisor to be on every shift. (Bonin Dep., Filing No. 134-7 at 87:22-91:5.) The EMS Supervisor position was created while Hurd was assigned to the Training Division. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 4 ¶ 19 & p. 23; Hurd Dep., Filing No. 134-12 at 231:2-234:6.) The minimum requirements for being an EMS Supervisor are being a Fire Captain or on the Captain's promotional list, being a system-certified Paramedic, and having functioned as an LF&R Paramedic Preceptor. (Bonin Dep., Filing No. 108-6 at CM/ECF p. 4 ¶ 21 & Ex. I.) The individuals chosen for EMS Supervisors and Backup EMS Supervisors are among the best Paramedics at LF&R. (Aff. Bonin, Filing No. 108-6 at Ex. I; Aff. Kruger, Filing No.108-12 at CM/ECF p. 2 ¶ 5.) The EMS Supervisor position comes with an 8.5% pay increase. (Hurd Dep., Filing No. 134-12 at 235:7-8.)

56.     Currently there are three full-time EMS Supervisors—Peter Eppens, Scott Wiebe, and Aaron Pospisil—all of whom have been in that position since at least June of 2011. Hurd was in the Training Division under his three-year contract at the time Eppens was promoted to EMS Supervisor in June 2011. Backup EMS Supervisors Mark Bridwell and Gregg Fisher have served in those positions since

18

2012. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 4 ¶¶ 18-20; Filing No. 108-25 (List of LF&R EMS Supervisors).)

57.     When Bonin served as the Division Chief in charge of EMS Services before Eppens took his place, Bonin was chiefly responsible for selecting EMS Supervisors and their backups, generally with input from the Fire Chief and LF&R's Medical Director, Jason Kruger. In 2012, LF&R did not have a formal application process for EMS Supervisors. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 4 ¶ 18.)

58.     Hurd never approached Medical Director Kruger about serving as an EMS Supervisor or Backup EMS Supervisor. The parties disagree as to whether Hurd approached Bonin regarding serving in those positions. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 4 ¶ 18; Aff. Kruger, Filing No. 108-12 at CM/ECF p. 2 ¶ 5; Hurd Dep., Filing No. 134-12 at 234:21-235:20.)

59.     For a time from 2012 to 2014, Nancy Crist was no longer able to work as a Backup EMS Supervisor because she did not apply to be on the Captain's promotional list, a requirement of the position. During the time that Crist could not work as an EMS Supervisor, Dean Delaney was selected to fill the position. His selection was based on discussion between Bonin, Medical Director Jason Kruger, and the other primary EMS Supervisors. Delaney is an excellent Paramedic who, prior to his appointment as Backup EMS Supervisor in 2012, had most recently worked as a Preceptor in 2012. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 4 ¶¶ 21-22.)

60.     Beginning in or around March 2015, Backup EMS Supervisor Nancy Crist took injury leave from LF&R for several months. Crist's position was not backfilled when she was out because it has never been LF&R's practice to fill a temporary vacancy in the Backup EMS Supervisor position. In short, LF&R has never appointed an alternate to the alternate for an EMS Supervisor. A similar circumstance presented itself in 2013 when Backup EMS Supervisor Gregg Fisher was on extended injury leave and his position was not filled. In the event a primary EMS Supervisor

is unable to work on his or her assigned shift, and the Backup EMS Supervisor for that shift is also unavailable, an EMS Supervisor or Backup EMS Supervisor from another shift is assigned to fill in. (Aff. Bonin, Filing No. 108-6, at CM/ECF pp. 5 ¶ 24 & Ex. H; Filing No. 21 at CM/ECF p. 6 ¶ 32; Filing No. 108-25 (list of LF&R EMS Supervisors).)

61.     Bonin would not have considered Hurd for Crist's Backup EMS Supervisor position because of Hurd's RSI suspension and because Hurd has never served as a Preceptor or formally precepted anyone. Hurd claims he served as a Preceptor prior to 2007. (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 5 ¶ 23; Aff. Pospisil, Filing No. 108-14 at CM/ECF p. 2 ¶ 6; Hurd Dep., Filing No. 134-12 at 241:17-245:24.)

## Number of Ambulance Unit Assignments

62.     Hurd was assigned to a medic ambulance unit more than some other individuals. Hurd believes he lost out on valuable training opportunities as a Captain because of his frequent placement on the ambulance. (Filing No. 21 at CM/ECF p. 6 ¶ 33.) Hurd worked 614 hours (23.2% of his time) on the ambulance in 2015. Other Captains who were assigned to stations that did not have a dedicated medic unit in 2014-2015 had far less hours on the medic unit than Hurd, including Mark Bridwell (390 hours/13.1%); Craig Clark (412 hours/15%); Peter Eppens (0 hours/0%); Andrew Evans (410 hours/13.3%); Dave Kluthe (418 hours/15.4%); David Lorenzen (376 hours/13.1%); Francisco Martinez (285 hours/10.6%); Guy Pinkman (528 hours/18.5%); Aaron Pospisil (0 hours/0%); Richard Schneider (322 hours/12.6%); and Scott Wiebe (54 hours/1.9%). None of these individuals ever filed a formal or informal complaint of harassment, discrimination, or retaliation. (Aff. Brandon, Filing No. 117-13 at Ex. M.)

63.     Overall, 46 LF&R employees had medic unit hours in excess of 1,000 hours in 2015. (Filing No. 108-24.) Two of the individuals who logged more medic

hours than Hurd in 2015—Captain Paramedic Bruce Elsberry (1,216 hours) and Captain Paramedic John Hibberd (723 hours)—worked at a station with a designated medic unit, so Hurd believes they would be expected to work on the ambulance more frequently. (Aff. Hurd, Filing No. 116-1, CM/ECF pp. 12-13 ¶¶ 40-41.)

## Station 11

64.     On or about January 26, 2012, Hurd requested to be removed from the Training Division, as he had finished the required amount of time in the Training Division pursuant to his contract. (Bonin Dep., Filing No. 134-7 at 63:4-64:7; Taylor-Riley Dep. Ex., Filing No. 114-4, Ex. 42; Hurd Dep., Filing No. 134-12 at 50:1-55:11, 201:7-204:25, 215:7-216:20.) Hurd transferred from the Training Division to Station 11, the scheduling station, which was under the supervision of Assistant Chief Borer. Hurd became one of three Fire Captains at Station 11, who together with LF&R staff, were responsible for coordinating staffing, including overtime and vacation time for all LF&R employees.[11] (Aff. Bonin, Filing No. 108-6 at CM/ECF p. 3 ¶ 13; Aff. Borer, Filing No. 108-4 at CM/ECF p. 2 ¶ 6.)

65.     As part of his duties as a Fire Captain of Station 11, Hurd was required to supervise firefighters performing a hose test on Engine 11, although Hurd watched the first test from inside the office where he was waiting for a fax of the "hose-testing numbers" to make sure that all of the hose was accounted for. Hurd and two other firefighters repeated the test after Hurd exited the office because they heard a "clunking noise" during the first test.

66.     On August 3, 2012, Battalion Chief Borer gave Hurd an Employee Incident Report ("EIR") for risking damage to the pump caused by the hose testing.

---

[11]Hurd's objection to this statement of fact is unintelligible. (Filing No. 113 ¶ 54 Response ("Admit with qualification. Station 11 Fire Captains assisting it coordinating staff, but Borer.").

Initially, it was just a verbal reprimand, but then became an EIR due to the fact that the pump was allegedly damaged and required repair and costs after the test was conducted. Hurd testified that the mechanic who looked at the pump concluded there was no damage, and no repairs were actually made to the pump.[12] (Aff. Huff, Filing No. 108-3 at CM/ECF pp. 2-3 ¶ 9; Aff. Borer, Filing No. 108-4 ¶ 7 & Ex. A; Filing No. 21 at CM/ECF p. 4 ¶ 18; Hurd Dep., Filing No. 115-8 at 249:3-262:23.)

67.    Typically, when Battalion Chiefs impose discipline, it would be to Captains as their direct subordinates, but generally not to Fire Apparatus Operators, Firefighters, or Firefighter/Paramedics like Hurd. Then, if appropriate, those Captains would generally be responsible for recommending discipline to their respective Chief, who would ultimately impose the discipline on their direct subordinates, such as Fire Apparatus Operators, Firefighters, and Firefighter/Paramedics. (Aff. Huff, Filing No. 108-3 at CM/ECF pp. 3 ¶ 11; Aff. Borer, Filing No. 108-4 at CM/ECF pp. 2-3 ¶ 9; Aff. Linke, Filing No. 108-8 at CM/ECF p. 2  ¶ 7.)

68.    LF&R employees besides Hurd have received EIRs and written reprimands to correct their conduct. For instance, Acting Captains Andy Evans and Tim Stohlman received written warnings when an engine's pump was run dry on May 20, 2014. (Aff. Huff, Filing No. 108-3 at CM/ECF pp. 3 ¶ 13 & Ex. E.)

69.    In October 2013, Hurd removed his name from the Battalion Chief promotion list because he wanted to stay on Engine 11, Station 11, and if he remained on the Battalion Chief promotional list, he would have been transferred to a different station and/or a different shift. (Hurd Dep., Filing No. 134-12 at 323:15-324:4; Aff. Huff, Filing No. 108-3 at CM/ECF p. 4 ¶ 14.)

70.    In April 2014, Hurd requested to have his name placed back on the

---

[12]Defendants do not object to the testimony regarding the lack of actual damage and repairs to the pump on the grounds of hearsay. (Filing No. 128 at CM/ECF p. 11.)

Battalion Chief promotion list. (Aff. Huff, Filing No. 108-3 at CM/ECF p. 4 ¶ 16.)[13]

## Drug Logbook Errors

71.    On June 24, 2013,  Hurd checked the seal tags on a medication. The seal on the medication was not tampered with, and there were no entries made in the logbook from the previous shift. This means that the logbook numbers should have remained the same, so Hurd did not double-check the seal tag number on the medication carried on the truck. However, it was later discovered that the seal tag had been inappropriately changed by another employee, and that employee had failed to record the change in the logbook. (Hurd Aff, Filing No. 116-1 ¶ 24.)

72.    On July 24, 2013, Borer went to Station 11 to give Hurd a reprimand for the drug logbook error. Firefighter Sten Ulrich and Hurd were at Station 11 when Borer arrived. Hurd expressed to Borer that the manner in which Bonin hand-selected his EMS Supervisors and Acting Supervisor back-ups was unfair because there was not a process, qualification procedure, or policy in place. Borer stated that several LF&R Chiefs "had trust issues" with Hurd "because of [Hurd's] EEOC State of Nebraska Complaint [he] filed within the department last year," and that these "trust issues" were "a major consideration . . . why [Hurd] was not chosen and or asked to be considered for the position." (Taylor-Riley Dep. Ex., Filing No. 114-5 at Ex. 81 (Hurd's signed notes dated Aug. 5, 2013, memorializing Borer's statements).) Borer does not deny that he made these statements; rather, he "do[es] not recall" making such statements. (Aff. Borer, Filing No. 108-4 ¶ 13.) Hurd complained to Borer that if he was denied the EMS Supervisor position because of his NEOC/EEOC Charge, he was being illegally retaliated against. Borer then reached into his folder and pulled

---

[13]I do not consider Hurd's statements of fact regarding "acting out-of-grade" (Filing No. 113 at CM/ECF pp. 84-85) because such allegations were not included in either of his NEOC/EEOC Charges (Filing No. 108-16; Filing No. 108-19), and are therefore irrelevant to his employment claims.

out a written reprimand for Hurd regarding the logbook issue. (Taylor-Riley Dep. Exs., Filing No. 134-3 at Exs. 79 & 80; Aff. Hurd, Filing No. 116-1 at CM/ECF p. 9 ¶ 26 & Exs. F, G, H (found at Filing Nos. 116-7, 116-8, 116-9); Hurd Dep., Filing No. 134-12 at 266:18-268:7; Borer Dep., Filing No. 134-9 at 151:9-159:6.)[14]

73.    Borer issued the written reprimand at the request of Bonin, who advised that this was Hurd's second such error. Borer issued the discipline because Hurd reported directly to him and not to Bonin. (Aff. Borer, Filing No. 108-4 at CM/ECF p. 3 ¶¶ 11-12 & Ex. C; Aff. Bonin, Filing No. 108-6 at CM/ECF pp. 3 ¶ 16 & Ex. F; Filing No. 21 at CM/ECF p. 4 ¶ 21.)

74.    On August 1, 2013, Borer again came to Station 11. Hurd asked Borer why he received elevated discipline for his logbook error and for the damage that was done to Engine 11's pump. Borer told Hurd that Hurd's bad history in the department caused Hurd to receive elevated discipline and that Hurd's NEOC/EEOC Charge was the reason for Hurd's problems. Borer told Hurd the next level of discipline Hurd would receive was suspension. (Taylor-Riley Dep. Ex., Filing No. 134-3 at Ex. 81 & Filing No. 134-4 at Ex. 84.)[15]

75.    On or about March 1, 2014, while Hurd was serving on a medic unit assigned to Station 6, Hurd noticed that Gregg Fisher, another Firefighter/Paramedic, had not performed the mandatory drug expirations, so Hurd assisted Fisher in removing all the expired drugs from the medic unit. However, after Hurd's shift, he was informed that Fisher wrote down the wrong logbook number. Hurd called his

_____

[14]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

[15]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

EMS Supervisor to inform him of the error so the EMS Supervisor could correct it. (Hurd Dep., Filing No. 134-12 at 272:20-274:13; Taylor-Riley Dep., Filing No. 135-1 at pp. 22-28.)

76.     Following a predisciplinary hearing in May 2014, Hurd received a written warning from Battalion Chief Derald Murrell, his direct supervisor, for the March 2014 drug logbook error. (Aff. Huff, Filing No. 108-3 at CM/ECF p. 3 ¶ 10 & Ex. D; Aff. Borer, Filing No. 108-4 at CM/ECF p. 4 ¶ 15; Filing No. 108-22; Filing No. 108-23; Hurd Dep., Filing No. 115-8 at 271:19-280:22.)

77.     In 2013 and 2014, approximately 17 LF&R employees received written warnings and written reprimands for drug logbook errors, including Gregg Fisher. (Aff. Huff, Filing No. 108-3 at CM/ECF pp. 3-4 ¶ 13 & Ex. E.)[16]

78.     Discipline for drug logbook errors was important to prevent multiple continuous errors and to maintain LF&R's narcotics license, as described in LF&R Management Policy 865.01. (Aff. Bonin, Filing No. 108-6 at CM/ECF pp. 3-4 ¶ 17

---

[16]Defendants have filed as evidence a chart prepared by LF&R purporting to summarize "employee corrective actions during the relevant time period." (Aff. Huff, Filing No. 108-3 ¶ 13 & Ex. E .) The documents that are the source of the information reflected in the chart are not included in the exhibit, nor is information regarding who prepared the chart, the methods used to formulate the chart, the accuracy of the summary, whether Hurd was given access to the documents underlying the summary, and whether the underlying documents would be admissible. As presented, the chart lacks foundation. *See* Fed. R. Evid. 1006; *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 245 (2003) (proponent of summary used in context of summary judgment motion must properly authenticate it and fulfill requirements of Fed. R. Evid. 1006). However, it is possible for Defendants to present this chart "in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Furthermore, Huff's affidavit—to which the chart is attached—is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Therefore, the court will consider this evidence.

& Ex. G.)

## Employees' Comments

79.    In response to Borer's comments to Hurd described above, Casady and Pashalek told Borer he should not tell Hurd he did not get promoted to EMS Supervisor because he filed an NEOC/EEOC Charge because "[i]t could be perceived as being retaliation." Pashalek explained that "we shouldn't say that in general to anybody who is seeking a promotion or any type of opportunity and making comments that they wouldn't get it because they had filed a complaint." (Pashalek Dep., Filing No. 134-11 at 105:9-108:14.)

80.    Huff believes that "harassment, discrimination and retaliation" are "fairly common" in today's workplace, and that "fire departments have traditionally been mostly white male workplaces." (Huff Dep., Filing No. 134-6 at 50:9-17.)

## Involuntary Transfer to Station 12

81.    In December 22, 2013, Hurd sent Borer, his supervisor, his goals for 2014:

> My goal for 2014 is to be able to stay at Station 11. I would like the same right as any other Captain in this department if I choose to transfer per union contract and city policy. My other goal for 2014 is to await the completion of this internal investigation by Kimberley Taylor Riley and to see her findings and hold those accountable. Thank you.

(Aff. Hurd, Filing No. 116-1 ¶ 29; Taylor-Riley Dep., Filing No. 114-6 at Ex. 87.) Borer forwarded Hurd's goal email to Huff, who then forwarded it to Doug McDaniel, the Human Resources Director for the City, and Pashalek. (Taylor Riley Dep. Exs., Filing No. 114-6 at Ex. 87; Pashalek Dep., Filing No. 115-5 at 117:22-118:10 & Filing No. 115-6 at Ex. 161.)

82.     In April 2014, LF&R performed some transfers, purportedly to allow for the training of other Captains to occur at Station 11 on LF&R's automated staffing-management system ("telestaffing") maintained by personnel at Station 11 only. That month, Hurd was involuntarily transferred from Station 11 to Station 12. (Hurd Dep., Filing No. 134-12 at 61:5-20, 219:9-228:16; Taylor-Riley Dep., Filing No. 114-6 at Exs. 95, 105.) Defendants claim that Hurd was transferred from Station 11 to Station 12 to allow another Captain to be trained in telestaffing. (Aff. Borer, Filing No. 108-4 at CM/ECF p. 4 ¶ 16 & Ex. B; Aff. Huff, Filing No. 108-3 at CM/ECF pp. 4 ¶ 15 & Ex. F.) Hurd believes he was transferred in retaliation for complaining about discrimination, harassment, and retaliation, especially since the station and shift to which he was being transferred were staffed by "all the members in [his] state complaint." (Hurd Dep., Filing No. 115-8 at 216:21-228:19; Taylor-Riley Dep. Ex., Filing No. 114-6 at Ex. 95.)

83.     Hurd claims that eight Captains who served at Station 11 from 2014 forward were not involuntarily transferred, but instead requested to be transferred, following the alleged change in the telestaff-training policy, and that only one other Captain besides Hurd was involuntarily moved from Station 11 because he was demoted for allegedly manipulating telestaff to increase his pay. There were no similar allegations against Hurd when he was involuntarily transferred from Station 11. (Aff. Hurd, Filing No. 116-1 ¶ 28.)

84.     Article 8, Section 3, of the union contract gives the Fire Chief the ability to supersede the normal transfer process when it is in the best interest of LF&R, such as for training purposes or to maintain LF&R's Advance Life Support service, which requires at least one Paramedic to be assigned to each "rig." (Aff. Borer, Filing No. 108-4 at CM/ECF pp. 4 ¶ 16 & Ex. B; Aff. Bopp, Filing No. 108-9 at CM/ECF pp. 1-2 ¶¶ 4-5.)

85.     Hurd did not file a grievance regarding the involuntary transfer because, Hurd admits, the LF&R union contract allowed Chief Huff to make such decisions.

27

(Hurd Dep., Filing No. 134-12 at 225:7-226:9.)

86.     Involuntary transfers have occurred in the past under this union contract provision to facilitate medics at each engine company. (Aff. Borer, Filing No. 108-4 at CM/ECF pp. 4-5 ¶¶ 16-17; Aff. Bopp, Filing No. 108-9 at CM/ECF p. 2 ¶¶ 6-7 (Firefighters Schmidt and Roscoe transferred involuntarily); Filing No. 127-5 (Captain Grell transferred involuntarily).)

87.     When Hurd was removed from Station 11, Borer removed Hurd's telestaffing rights, which prevented Hurd from doing any of the staffing duties he enjoyed at Station 11. (Hurd Dep., Filing No. 134-12 at 224:13-225:6.)

## Battalion Chief Promotions

88.     After Chief Huff retired in June 2015, Casady appointed Tim Linke to serve as Interim Chief of LF&R from June 2015 to July 2016. During his service as Interim Chief, Linke was charged with making two Battalion Chief promotions, one effective in August 2015 for Pashalek's replacement after her retirement, and one effective in early December 2015. (Aff. Linke, Filing No. 108-8 at CM/ECF p. 3 ¶ 12; Linke Dep., Filing No. 134-10 at 117:14-22; Huff Dep., Filing No. 134-6 at 170:3-10.)

89.     LF&R Management Policy 202.23 (effective Apr. 28, 2014), entitled "Promotional Process to Battalion Chief," governs the promotional process for Battalion Chiefs for 2014 to the present. Under the policy, only the top six candidates are "eligible for promotion." (Filing No. 108-8 at CM/ECF pp. 4-6.) The only provision in LF&R Management Policy 202.23 addressing Battalion Chief promotional candidates "moving up" on the list states: "After a candidate in the top six (6) is *selected*, the number seven (7) candidates will then move into the top six (6) and so on down the line." (Filing No. 108-8 at CM/ECF p. 6 (emphasis added).)

28

90.     Under this policy, the Battalion Chief promotional process includes the ranking of five different components: (1) professional development through experience and training (10%); (2) education (5%); (3) an assessment center consisting of a written exercise (45%); (4) an oral interview (35%); and (5) the applicant's seniority (5%), with different components being ranked by different individuals. The oral interview is ranked by three individuals not employed by LF&R. (Filing No. 21 at CM/ECF p. 5 ¶ 25; Aff. Linke, Filing No. 108-8 at CM/ECF pp. 4-8 & Exs. A, B; Filing No. 108-26.)

91.     At the time relevant to this case, the portfolio and assessment-center sections were graded by Chief Officers. (Hurd Dep., Filing No. 134-12 at 324:13-326:18, 327:15-328:5.) Defendants Borer and Pashalek evaluated the candidates for professional preparation and experience (15% of total score), and Pashalek and Bonin evaluated the education portfolio (5% of total score). (Aff. McDaniel, Filing No. 108-10 at CM/ECF p. 2 ¶ 7 & Ex. A; Aff. Casady, Filing No. 108-2 at CM/ECF p. 4 ¶ 16; Aff. Linke, Filing No. 108-8 at CM/ECF pp. 7-8 at Ex. B; Filing No. 108-26 (list of 2014 Battalion Chief Assessors).)

92.     After the 2014-2016 ranking process ended, Hurd was ranked seventh out of seven candidates. The total points received by each of the seven candidates were as follows:

|                |       |
|----------------|-------|
| Brian Giles    | 74.00 |
| Jeremy Gegg    | 58.08 |
| Shane Cuttlers | 52.33 |
| James Bopp     | 49.34 |
| Lloyd Mueller  | 45.75 |
| Scott Bastin   | 45.67 |
| Troy Hurd      | 31.25 |

(Aff. Linke, Filing No. 108-8 at CM/ECF p. 3 ¶ 13 & Ex. B; Hurd Dep., Filing No. 134-12 at 325:17-22; Linke Dep., Filing No. 134-10 at 113:4-114:8 & Filing No. 115-

4 at Ex. 139; Aff. McDaniel, Filing No. 108-10 at CM/ECF p. 2 ¶ 6 & Ex. A; Aff. Casady, Filing No. 108-2 at CM/ECF p. 3 ¶ 15; Filing No. 21 at CM/ECF p. 5 ¶ 27.)

93.     After the candidates are objectively scored and ranked for purposes of the "eligibility list," "the chief has to look at some subjective items in order to make a decision. . . . It's impossible just to do that in an objective fashion." (Linke Dep., Filing No. 115-3 at 149:3-11.) To fill the positions, Linke was looking for "an individual who demonstrated not only some humility in regard to their leadership style, but also a desire to . . . move the department forward." He wanted someone who would be "a good fit for the command staff and help to . . . start moving things in the right direction," as well as someone who had experience in making the "folks around them feel safe." (Linke Dep., Filing No. 115-3 at 125:23-126:20.)

94.     For the first promotion, Linke conducted interviews of the top six candidates on the promotional list. Linke did not interview Hurd for the August 2015 Battalion Chief promotion because Hurd was the seventh-ranked candidate. (Aff. Linke, Filing No. 108-8 at CM/ECF p. 7.)

95.     Linke offered the Battalion Chief promotion to three of the top six candidates, two of whom refused. (Linke Dep., Filing No. 134-10 at 139:15-140:18, 141:21-142:4, 143:22-24.) Ultimately, James Bopp was selected for the August 2015 promotion because of "[h]is 30 years of experience with the department, his level of activity with the urban search and rescue team, instructing hazmat, hazmat team, his experience with the . . . military and the Air National Guard as a firefighter." He had been a Firefighter Paramedic and a long-term captain. (Linke Dep., Filing No. 134-10 at 143:22-144:10, 169:2-7.)

96.     Linke testified that if all of the top six candidates had declined the promotion, he would have considered interviewing additional people. (Linke Dep., Filing No. 134-10 at 143:17-21.) Hurd claims that because two of the top six

candidates turned down the promotion, he should have been interviewed.[17] (Aff. Linke, Filing No. 108-8 at CM/ECF pp. 3 ¶¶ 12-14 & Ex. B; Aff. Hurd, Filing No. 116-1 ¶ 37; Linke Dep., Filing No. 134-10 at 107:1-116:10, 124:4-125:13 & Filing No. 115-4 at Ex. 139.)

97.     After the first promotion was complete, Hurd moved into sixth place on the promotion list, so Linke interviewed Hurd for the December 2015 Battalion Chief promotion. During the interview, Hurd complained that the promotional process was unfair and about the retaliatory atmosphere at LF&R. Hurd told Linke he did not think he was the best candidate for Battalion Chief because he did not believe he could work with the Battalion Chiefs who had retaliated against him. However, he stated that he would not refuse a promotion to Battalion Chief. (Aff. Linke, Filing No. 108-8 at CM/ECF p. 3 ¶¶ 14, 15; Hurd Dep., Filing No. 108-27 at CM/ECF p. 6 at 331:19-332:23; Linke Dep., Filing No. 115-3 at 152:5-166:4 & Filing No. 115-4 at Exs. 146.)

98.     During his interview of Hurd, Linke "felt like we were having a difficult time staying on track. And . . . he was talking and talking and talking" and "he was starting to get at least a little bit upset." (Linke Dep., Filing No. 115-3 at 163:1-13.)

99.     In his "action plan" that was required to be considered for the promotion, Hurd suggested retaliation training for LF&R and mentioned the two-year investigation into his complaint of retaliation. (Linke Dep. Exs., Filing No. 115-4 at Exs. 146 & 153.)

---

[17]Hurd's proposed statement of fact regarding how Eric Jones moved up on the promotions list in 2011 after three individuals removed themselves from the promotions process will not be considered. The promotional process in 2011 is irrelevant to the process that occurred subsequent to the April 28, 2014, version of Management Policy 202.23. (Aff. Linke, Filing No. 108-8 at CM/ECF pp. 4-6.)

100.    Linke chose the second-ranked candidate, Jeremy Gegg, for the position because he "was more qualified." During the interview, Linke thought that Gegg "showed the greatest level of humility . . . throughout the interview. . . . He's very even keeled and even tempered, and that showed in his interview." (Aff. Linke, Filing No. 108-8 at CM/ECF p. 3 ¶ 14; Linke Dep., Filing No. 115-3 at 125:7-13.)

101.    Hurd maintains that he complained to Pashalek, McDaniel, and Huff about the unfairness of having the Chiefs that were the subject of his internal EEO Complaint (Borer, Pashalek, Huff, and Bonin) participate in the judging process, but they were not removed from their judging duties. Linke testified that he was unaware of Hurd's complaints prior to the interview. (Hurd Dep., Filing No. 134-12 at 324:13-328:5; Linke Dep., Filing No. 134-10 at 107:1-117:13, 161:2-163:23; Taylor-Riley Dep. Exs., Filing No. 114-7 at Ex. 107; Aff. Hurd, Filing No. 116-1 ¶¶ 34-37.)

102.    During the oral-interview process, Hurd was not able to discuss riding "out-of-grade" because he had not been allowed to do so. In his oral interview, Hurd discussed improving the retaliatory environment at LF&R. Hurd discussed his EEO complaint and how he handled a situation where he witnessed discrimination and harassment.[18] (Aff. Hurd, Filing No. 116-1 ¶ 34.)

103.    Mueller applied for, and was ranked fifth, on the Battalion Chief promotion list, but was not chosen as Battalion Chief in August 2015 or December 2015. (Aff. Mueller, Filing No. 108-13 at CM/ECF p. 3 ¶ 13; Aff. Linke, Filing No. 108-8 at CM/ECF p. 7.)

104.    Linke made both promotional decisions in 2015 partly to "keep the

---

[18]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

peace" in LF&R, but also because the promoted candidates were "competent members" of LF&R, they "could also safely operate in an incident," "they had the ability to take whatever position . . . they received and move forward with it," and he "needed some people that could support the department." Linke believes that if the candidates' "assessment center score . . . [was] the only objective measure" being considered, the selected candidates would not be "the most objectively qualified candidates for the position." (Linke Dep., Filing No. 134-10 at 173:2-175:3.)

105.   Pashalek, Casady, Huff, and Bonin do not recall being consulted or having any input into whom Linke chose as Battalion Chief for the second promotion for which Hurd was interviewed. Hurd claims that Linke spoke with Bonin, Casady, and Borer about the promotion. (Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 5 ¶ 21; Aff. Casady, Filing No. 108-2 at CM/ECF p. 4 ¶ 17; Aff. Bonin, Filing No. 108-6 at CM/ECF p. 24 ¶ 26; Aff. Huff, Filing No. 108-3 at CM/ECF p. 4 ¶ 19; Linke Dep., Filing No. 134-10 at 121:20-123:8, 152:5-166:4, 173:2-175:3; Borer Dep., Filing No. 134-9 at 245:3-251:9.)

106.   Hurd has continued to receive annual merit-pay increases due to his satisfactory ratings on his annual employee-performance evaluations. Hurd has continued in the position of Fire Captain since his promotion in 2009 and was not demoted after any of his written discipline. He has also maintained the same benefits, with annual merit pay increases through 2014, at which time he reached the top of his pay range in his position as a Fire Captain. (Aff. Kant, Filing No. 108-11 at CM/ECF p. 2 ¶ 4; Aff. McDaniel, Filing No. 108-10 at CM/ECF p. 2 ¶¶ 8-9 & Exs. B, C.)

107.   Hurd believes that his complaints about the LF&R command staff discriminating against and harassing female and minority trainee Sara Khalil resulted in lower job-evaluation scores, which affected his ranking in the Battalion Chief promotional process; caused him to miss out on valuable work experience like riding "out of grade," which Hurd could have discussed in his promotional interview; made Hurd "miserable" and dread work; prevented Hurd from "ever moving up or moving

33

out into a higher-paying position"; denied Hurd the opportunity to receive a higher base pay as Battalion Chief, thereby reducing his "eventual pension"; and caused Hurd to see a therapist for mental-health issues. (Aff. Hurd, Filing No. 116-1 ¶¶ 33-34, 55-58.)

## Summary of Hurd's Discipline

108.   As Fire Chief, Huff signed off on Employee Written Reprimands for employees, but not all Employee Incident Reports, which are not considered discipline under the union contract. Huff signed Employee Written Reprimands on October 11, 2011, for Hurd's conviction of assault against his wife; on February 28, 2012, for Hurd's premature departure from a meeting; and on July 17, 2013, for Hurd's drug logbook error. Following a pre-disciplinary hearing in May 2014, Division Chief Derald Murrell issued Hurd an Employee Written Warning for a second logbook error that occurred on March 1, 2014. (Aff. Huff, Filing No. 108-3 ¶ 10 & Ex. D.)

109.   The Fire Chief is ultimately responsible for all discipline imposed at LF&R. The other Chiefs can make recommendations regarding discipline, but Huff made the final decisions and determined the sanctions. (Taylor-Riley Report, Filing No. 135-1 at pp. 34-35, 60-61; Huff Dep., Filing No. 134-6 at 45:12-20.)

## The EEO and NEOC/EEOC Complaints

110.   On either August 2 or August 8, 2012, Hurd filed an internal equal employment opportunity ("EEO") complaint with Taylor-Riley, the City's EEO Officer. (Aff. Pashalek, Filing No. 108-5 at CM/ECF p. 4 ¶ 16; Filing No. 21 at CM/ECF p. 4 ¶ 19.)

111.   On September 5, 2012, Hurd filed his first Charge with the Nebraska Equal Opportunity Commission ("NEOC") and Equal Employment Opportunity Commission ("EEOC") against the City of Lincoln. (Filing No. 108-16; Filing No. 21

at CM/ECF pp. 4-5 ¶ 20.)

112.    On January 30, 2013, the NEOC issued its determination on Hurd's first Charge, giving him 90 days to file an action in state court. (Filing No. 108-17; Filing No. 21 at CM/ECF pp. 4-5 ¶ 20.)

113.    On March 20, 2013, the EEOC issued its Right-to-Sue letter for Hurd's first Charge. (Filing No. 108-18.)

114.    On October 10, 2014—more than two years after Hurd's initial complaint—Taylor-Riley completed her investigation and report on Hurd's EEO complaint, and she forwarded the report to the City Mayor's Office. (Filing No. 21 at CM/ECF p. 4 ¶ 23.)[19]

115.    On or about September 11, 2015, Hurd filed his second Charge with the NEOC/EEOC. (Filing No. 108-19; Filing No. 21 at CM/ECF p. 7 ¶ 36.)

---

[19]Out of an abundance of caution, Hurd's statements of fact regarding the conclusions reached in this internal investigation (Filing No. 113 at CM/ECF pp. 85-87) shall not be considered. *Cf. Johnson v. Yellow Freight Systems, Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984) (district court did not abuse discretion in refusing to admit reports from the EEOC in a § 1981 case); *Achterberg v. Albaugh, LLC*, No. 5:16-CV-06097, 2017 WL 5924262, at *3 (W.D. Mo. Nov. 30, 2017) ("The Court finds evidence of any findings, conclusions, or opinions made by the investigator are excluded. However, Albaugh's statements it made during the investigation are admissible.") (citing *Johnson*, 734 F.2d at 1309); *Barnhardt v. Open Harvest Co-op.*, No. 4:12CV3156, 2013 WL 2250273, at *2 (D. Neb. May 22, 2013), *aff'd*, 742 F.3d 365 (8th Cir. 2014) (no-reasonable-cause finding by Commission on Human Rights following investigation of plaintiff's charge of discrimination excluded as unhelpful at summary-judgment stage of proceedings). If this matter goes to trial, the parties would be well-advised to determine whether a statement of an employee of a party (the City of Lincoln) who has the authority and duty to investigate is admissible under the Federal Rules of Evidence. The foregoing cases do not get to that issue.

116.   On March 16, 2016, the NEOC filed its Administrative Dismissal on Hurd's second Charge, giving him 90 days to file an action. (Filing No. 108-20.)

117.   On April 28, 2016, the EEOC issued its Right-to-Sue letter for Hurd's second Charge. (Filing No. 108-21.)

118.   LF&R generally notifies command staff when an NEOC/EEOC Charge has been filed, and command staff was notified when Hurd filed his Charges. (Borer Dep., Filing No. 134-9 at 121:20-126:23.)

## Defendants' Response to Internal Report

119.   On December 17, 2014, Defendant Mayor Chris Beutler sent a letter to Hurd indicating that he had reviewed the Taylor-Riley investigative findings; that he had met with Casady and Human Resources Director Doug McDaniel; and that the following disciplinary actions had been removed from Hurd's personnel file: the March 2012 reprimand for "insubordination" related to the January 2012 meeting, the August 2012 EIR documenting a verbal warning related to testing a fire hose, the July 2013 written reprimand for a drug logbook recording error, and the May 2014 written warning for a drug logbook recording error. Mayor Beutler also indicated that Casady was going to examine and potentially restructure the fire-training academy with the assistance of a task force; implement a mandatory training seminar regarding equal employment practices in general, and retaliation specifically, for all management-level employees; and review the process of imposing discipline to ensure that discipline is consistent. (Hurd Dep., Filing No. 134-12 at 312:23-313:6 & Ex. 111; McDaniel Dep., Filing No. 115-10 at 45:8-51:22 & Ex. 111; Taylor-Riley Dep., Filing No. 114-7 at CM/ECF p. 11, Ex. 111.)[20]

_____

[20]Defendants object to this statement of fact, asserted by Hurd, because Defendant Beutler's letter "speaks for itself." (Filing No. 128 at CM/ECF p. 10.) Because this paragraph is an accurate reflection of Beutler's letter, and because

120.   In April 2015, Hurd responded to an interview request from the Lincoln Journal Star newspaper regarding his complaints about LF&R. (Hurd Dep., Filing No. 134-12 at 306:2-315:8; Taylor-Riley Dep., Filing No. 114-7 at Ex. 113.) Casady and the Mayor's office also responded to the Journal Star's requests for comment. (Taylor-Riley Dep., Filing No. 114-7 at Exs. 113, 114.)[21]

121.   Hurd gave a radio interview on the Coby Mach show on KFOR, where he discussed what he perceived to be LF&R's failure to address the continued corruption at LF&R involving covering up the sham investigation into Khalil's treatment, the command staff's discriminatory and retaliatory treatment of Khalil in the preceptorship, and the retaliation Hurd suffered for complaining about it. (Hurd Dep., Filing No. 134-12 at 315:9-316:4.)[22]

122.   Following the Lincoln Journal Star article and the radio interview, and on November 13, 2014, Casady wrote a detailed memo to Mayor Beutler criticizing Taylor-Riley's internal investigation, but he did nothing to independently investigate

---

Defendants do not object to the admission of the letter, it will be considered. However, Hurd's proposed statement of fact regarding Trouba's letter that was allegedly hand-delivered to Beutler (Filing No. 113 at CM/ECF pp. 90-91) shall not be considered because Hurd does not cite anything other than "Trouba Aff., Ex. A" for its source. A "Trouba affidavit" is not identified on the docket sheet, and the court is not bound to undertake "an independent search of the record," especially when counsel have seen fit to file almost 2,000 pages of exhibits in conjunction with Defendants' Motion for Summary Judgment. Fed. R. Civ. P. 56(c)(3) (Advisory Committee Notes on 2010 Amendment).

[21]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

[22]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

Hurd's allegations, nor did he review Taylor-Riley's extensive file. (Casady Dep., Filing No. 134-8 at 30:15-70:21, 81:5-82:17; Taylor-Riley Dep., Filing No. 134-5 at Ex. 110.)[23]

123.   On or about May 21, 2015, Casady issued letters of "exoneration" to Borer, Pashalek, and Huff in conjunction with the Hurd investigation. (Taylor-Riley Dep., Filing No. 134-5 at Exs. 117, 118.) Casady also held two training sessions for command staff—one on retaliation and one on consistency in discipline. (Casady Dep., Filing No. 134-8 at 115:17-116:17, 125:1-21, 126:20-23.)[24]

## II.  STANDARD OF REVIEW

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue, but to decide whether there is a genuine issue for trial. *Schlif v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'"

---

[23]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

[24]Defendants "deny" this statement of fact proposed by Hurd, but they neither state grounds for denying it nor cite evidence disputing it. Therefore, it will be considered.

*Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id*. Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quotation and citation omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

## III. ANALYSIS

The basis for Hurd's claims is his belief that the Defendants created and perpetuated a hostile work environment by issuing repeated disciplinary actions against him, failing to promote him, assigning him to the medic ambulance unit more than any other Firefighter/Paramedic, and involuntarily transferring him to another station in retaliation for his (1) complaints about the Defendants' alleged discrimination and harassment of firefighter recruit Sara Khalil based on her sex and national origin and (2) his filing of two NEOC/EEOC charges.

### A. Constitutional Claims

Hurd's § 1983 claims allege retaliation under the Equal Protection Clause of the Fourteenth Amendment (1) against the City of Lincoln and the remaining Defendants in their official capacities for establishing, maintaining, and enforcing a policy, practice, custom, or procedure of retaliating against individuals like Hurd who complain about sexual and national-origin discrimination of another employee (Count

I); (2) against Defendants Casady, Huff, Borer, Bonin, Pashalek, and Benes in their individual capacities for treating people like Hurd who complain about sexual and national-origin discrimination, or who refuse to countenance such a hostile work environment, differently than similarly situated employees (Count II); and (3) against Defendants Casady, Huff, Borer, Bonin, Pashalek, and Benes in their individual capacities for conspiring with others to deprive Hurd of his constitutional rights (Count III).

The individual Defendants have asserted qualified immunity as to Counts II and III, and all Defendants have asserted that Hurd's Amended Complaint fails to state a claim upon which relief can be granted. (Filing No. 21 at CM/ECF p. 8 ¶ 46.) Defendants' Motion for Summary Judgment must be granted for both of these reasons—that is, Hurd's retaliation claims under § 1983 based on the Equal Protection Clause of the Fourteenth Amendment fail due to lack of a clearly established constitutional right.

## 1.  Counts II and III Against Defendants in Individual Capacities

"Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). Courts may address either prong of the analysis first, *Pearson v. Callahan,* 555 U.S. 223, 236 (2009), and "[t]he defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is

suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. . . .

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal quotations and citations omitted).

To my knowledge, neither the United States Supreme Court nor the Eighth Circuit Court of Appeals has held that the Equal Protection Clause itself prohibits retaliation based on discrimination suffered by a third party (here, Khalil), but complained about by the first party (here, Hurd).[25] *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1237 (8th Cir. 2013) (reversing district court's denial of qualified immunity on plaintiff's equal-protection retaliation claim because no established right exists under the Equal Protection Clause to be free from retaliation; "'The right to be free from retaliation is clearly established as a first amendment right and as a statutory right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation. We have only recognized that § 1983 provides a vehicle for redressing claims of retaliation *on the basis of the First Amendment*,'" and "[n]owhere in [the plaintiff's] complaint does he allege retaliation on the basis of the First Amendment") (quoting *Ratliff v. DeKalb County*, 62 F.3d 338, 340 (11th Cir. 1995)); *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("Although section 704(a) of Title VII may not be the basis for a retaliatory discharge

---

[25]Indeed, Hurd admits that "the 8th Circuit has not addressed whether claims for discrimination or retaliation for opposing illegal practices by complaining about the unlawful discrimination of a co-worker can provide a basis for a claim under the Equal Protection clause." (Filing No. 113 at CM/ECF p. 121.)

claim in a § 1983 action, § 1983 provides a vehicle for redressing claims of retaliation on the basis of the First Amendment.") (internal quotation marks and citation omitted); *Zimmerman v. Arkansas Dep't of Fin. & Admin.*, No. 5:17CV00160, 2018 WL 700850, at *3 (E.D. Ark. Feb. 2, 2018) (plaintiff could not bring retaliation claim under § 1983 because no established right exists under the Equal Protection Clause to be free from retaliation; there is such a right under the First Amendment, but plaintiff did not reference First Amendment in complaint) (citing *Burton*); *cf. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 605 (2008) ("we have never found the Equal Protection Clause implicated in the specific circumstance where . . . government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner").

Because Hurd does not have a clearly established right to be free from retaliation under the Equal Protection Clause, Hurd's equal protection and conspiracy claims (Counts II and III) against Defendants Casady, Huff, Borer, Bonin, Pashalek, and Benes in their individual capacities fail as a matter of law. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (if an official did not deprive plaintiff of a constitutional or statutory right, the plaintiff "does not need qualified immunity, as he is not liable under § 1983"); *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) ("[I]f the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. This is not to say, however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim.") (citation omitted); *In re Honorable John Dan Kemp*, No. 18-1864, 2018 WL 3213881, at *7 (8th Cir. July 2, 2018) ("[a]bsent a constitutional violation, there is no actionable conspiracy claim") (internal quotation marks and citations omitted).

Alternatively, because there was no constitutional violation, each of the individual Defendants is entitled to qualified immunity as to Counts II and III. *Pearson*, 555 U.S. at 243-44 ("An officer conducting a search is entitled to qualified

immunity where clearly established law does not show that the search violated the Fourth Amendment."); *Kulkay v. Roy*, 847 F.3d 637, 646 (8th Cir. 2017) (finding individual defendants entitled to qualified immunity when plaintiff failed to state Eighth Amendment claim).

Even if Hurd is asserting a "class-of-one" claim, as he argues in his brief, the claim still fails because the Supreme Court has held that class-of-one equal protection claims are not cognizable in the public-employment context. *Engquist*, 553 U.S. at 604-05 (holding that class-of-one equal protection claim is not cognizable in context of public employment; employment decisions are "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify"; in the public-employment context, "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship."; "recognition of a class-of-one theory of equal protection in the public employment context—that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all—is simply contrary to the concept of at-will employment. The Constitution does not require repudiating that familiar doctrine.").

> In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly "constitutionalize the employee grievance." *Connick* [*v. Myers*], 461 U.S. [138], at 154, 103 S. Ct. 1684 [(1983)]. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop* [*v. Wood*], 426 U.S. [341], at 349, 96 S. Ct. 2074 [(1976)]. Public employees typically have a variety of protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them.

*Engquist*, 553 U.S. at 609.

While Hurd could have brought a § 1983 retaliation claim under the First Amendment, he did not do so in either his Complaint (Filing No. 1) or Amended

43

Complaint (Filing No. 18). Rather, he clearly stated that his § 1983 retaliation claims were based on the "Equal Protection clause of the Fourteenth Amendment." (Filing No. 18 at CM/ECF p. 13 ¶ 75 & heading of Count II ("EQUAL PROTECTION VIOLATION").) Hurd's deadline to amend his Complaint, had he so desired, was two years ago. (Filing No. 13 at CM/ECF p. 2 (Final Progression Order setting deadline of June 30, 2016, to move to amend pleadings or add parties); Filing No. 15 (Joint Stipulation noting June 30, 2016, deadline to amend pleadings and allowing Amended Complaint to be filed by such date).)

Based on Hurd's pleadings, Defendants had no reason to know that Hurd was making any First Amendment claims and, therefore, failed to explore during the parties' extensive discovery phase issues unique to First Amendment claims, such as whether certain speech was protected and a matter of public concern. *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) (analyzing whether First Amendment protected public employee who provided compelled testimony outside of ordinary job responsibilities). Clearly, allowing Hurd to assert a First Amendment retaliation claim at this late date[26] would be highly prejudicial to Defendants, and Hurd has provided no explanation as to why such a claim was not raised long ago. Hurd cannot present good cause for raising a First Amendment claim now. *See Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 395 (8th Cir. 2016) ("[m]otions that would prejudice the nonmoving party by requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy are particularly disfavored") (internal quotation marks and citation omitted); *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989) (when a considerable amount of time has passed since the filing of a complaint and the motion to amend is made on the eve of trial and will cause prejudice and further delay, courts require the movant

---

[26]Discovery closed five months ago, and the parties' trial date has been continued to allow for the disposition of the pending Motion for Summary Judgment. (Filing No. 100 (deadline for deposing all fact witnesses and for completing all written discovery extended to February 16, 2018); Filing No. 130.)

to provide some valid reason for the belatedness of the motion); *see also* Fed. R. Civ. P. 16(b)(4) (scheduling orders pertaining to such items as amending pleadings and discovery "may be modified only for good cause and with the judge's consent"); *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) ("Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order"); *Nat'l Liberty Corp. v. Wal-Mart Stores, Inc.*, 120 F.3d 913, 917 (8th Cir. 1997) (district court did not err in finding prejudice to the plaintiff when defendant sought leave to amend counterclaim three months after deadline, without explanation for its untimeliness, and amendment would require retaking depositions of witnesses who were likely to have knowledge of claim to be added).

Therefore, Counts II and III, asserted against the Defendants in their individual capacities, must be dismissed with prejudice.

## 2. Count I Against City and Defendants in Official Capacities

Because Hurd cannot bring a § 1983 retaliation claim under the Equal Protection Clause, Hurd necessarily has failed to state a § 1983 claim that a violation of his equal protection rights was caused by a City policy, custom, or deliberately indifferent failure to train. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (municipalities can be liable under § 1983 for failure to train) ((citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978) (municipalities can be liable under § 1983 only when City's policies are the moving force behind the constitutional violation)); *Doe By and Through Doe v. Washington County*, 150 F.3d 920, 922 (8th Cir. 1998) (governmental entities can be liable where municipal policy or custom causes constitutional violation) (citing *Monell*; *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 676 (8th Cir. 2007) ("We note that the alleged facts do not show a constitutional violation by an individual . . . defendant, and therefore, neither the City nor [other defendant in his official capacity] can be liable under § 1983."); *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) ("This circuit has consistently

recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."). Therefore, Count I, asserted against the City of Lincoln and the remaining Defendants in their official capacities, must be dismissed with prejudice.

## B.  Claims Under Title VII and NFEPA

Hurd asserts retaliation claims under Title VII and the NFEPA. (Filing No. 18 at CM/ECF pp. 15-17.) Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated . . . in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a) (Westlaw 2018). The NFEPA similarly makes retaliatory action unlawful. Neb. Rev. Stat. § 48-1114 (Westlaw 2018).

> The "employee has the initial burden of establishing a prima facie case of retaliation by showing that (1) [he] engaged in protected conduct, (2) [he] suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). The "ultimate question" is "whether the employer's adverse action against the employee was motivated by retaliatory intent." *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 985 (8th Cir. 2011) (quotation omitted).

*Rebouche v. Deere & Co.*, 786 F.3d 1083, 1088 (8th Cir. 2015).

### 1.  Merits of Retaliation Claim

After review of the parties' massive evidentiary submissions and overly lengthy briefs, I conclude that summary judgment as to Hurd's retaliation claims under Title VII and the NFEPA must be denied because there are genuine disputes as to material facts regarding whether a reasonable employee would have found the challenged

employment actions materially adverse; whether the Defendants' alleged adverse actions taken against Hurd were motivated by retaliatory intent; and whether Hurd's protected activity was the "but-for" cause of the alleged adverse employment actions—specifically, whether the City's stated reasons for its actions were a pretext to hide retaliation against Hurd. *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"; noting that "this standard requires the plaintiff to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct.") (internal quotation marks and citation omitted); *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) ("The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action."); *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (retaliation must be the "but-for" cause of the adverse employment action); *AuBuchon v. Geithner*, 743 F.3d 638, 642 (8th Cir. 2014) ("an employee demonstrating an adverse employment action must 'show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'") (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)); *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006) (although plaintiff female firefighters did not suffer loss of pay or rank from city's failure to assign them to special shift duties, "jury was free to believe . . . that these failures produced a material employment disadvantage" when such opportunities were provided to males of equal and lesser rank; "The denial of special shift designations and an opportunity to work out-of-class . . . deprived the plaintiffs of essential on-the-job training, leaving them to feel less competent when performing their job functions and depriving them of beneficial prior experience when seeking promotions"); *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003) ("This court has recognized, however, that actions that disadvantage or interfere with an employee's ability to do his or her job, as well as 'papering' an employee's file with negative reports or reprimands, are

sufficiently adverse to meet the Title VII standard for retaliation claims.").

## 2.  Time-Barred Claims

Defendants argue that (1) Hurd's allegations of unlawful acts contained in his first NEOC/EEOC Charge[27] are time-barred because Hurd's "right-to-sue" letter was issued on March 20, 2013,[28] and Hurd did not file suit until three years later (February 26, 2016), which is beyond the 90-day deadline set forth in 42 U.S.C. § 2000e-5(f)(1) and Neb. Rev. Stat. § 48-1120.01; and (2) unlawful acts occurring more than 300 days before the filing of Hurd's second NEOC/EEOC Charge[29] (dated September 11, 2015) are time-barred under 42 U.S.C. § 2000e-5(e)(1) and Neb. Rev. Stat. § 48-1118(2). (Filing No. 109 at CM/ECF pp. 56-63; Filing No. 128 at CM/ECF pp. 56-58.)

## a.  Failure to File Suit on First Charge Within 90 Days

Title VII requires plaintiffs to file suit in federal district court within 90 days of receiving a right-to-sue notification. 42 U.S.C. § 2000e-5(f)(1).[30] The NFEPA dictates that the plaintiff file suit within 90 days after receiving notice of the last action the NEOC/EEOC will take on the complaint or charge, such as the issuance of the final order after hearing or the determination of reasonable cause or no reasonable

---

[27]Filing No. 108-16 (signed and dated as received by NEOC on September 5, 2012).

[28]Filing No. 108-18.

[29]Filing No. 108-19 (received by the Omaha NEOC Office on September 11, 2015).

[30]42 U.S.C.A. § 2000e-5(f)(1) states in part: "the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent . . . ."

cause. Neb. Rev. Stat. § 48-1120.01.[31] Clearly, Hurd did not meet this deadline as to his first NEOC/EEOC Charge.

While the 90-day limitation period in § 2000e-5(f)(1) "is not a jurisdictional prerequisite to federal suit and is, therefore, subject to equitable tolling in appropriate circumstances," Hurd does not make a tolling argument here. *Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8th Cir. 1989). In fact, he "concede[s]" that claims based on acts occurring prior to the deadline for filing a lawsuit based on his first NEOC/EEOC Charge are time-barred under Title VII and the NFEPA, and that only "actions occurring after April 30, 2013" should be considered. (Filing No. 113 at CM/ECF p. 213.) Based on this concession, any of Hurd's claims that are based on events occurring before April 30, 2013, are time-barred. However, this makes little difference as a practical matter because incidents occurring before April 30, 2013, may be considered as part of the alleged hostile work environment, as explained below.

### b.  Actions Occurring Outside 300-Day Window on Second Charge

Under Title VII and the NFEPA, Hurd had 300 days from the date the alleged unlawful employment practice occurred to file an administrative charge. 42 U.S.C. § 2000e-5(e)(1); Neb. Rev. Stat. § 48-1118(2). Defendants argue that claims based on alleged retaliatory acts occurring outside this 300-day period are time-barred under these provisions.

Hurd's Amended Complaint alleges that the City retaliated against him by

---

[31]"The deadline for filing an action directly in the district court is ninety days after the complainant receives notice of the last action the commission will take on the complaint or charge. . . . The last action on the complaint or charge includes the issuance of the final order after hearing, the determination of reasonable cause or no reasonable cause, and any other administrative action which ends the commission's involvement with the complaint or charge." Neb. Rev. Stat. § 48-1120.01.

creating a hostile work environment because he complained about sexual and national-origin harassment of a fellow employee and because he filed charges with the NEOC/EEOC. (Filing No. 18 at CM/ECF pp. 12-14 (Counts I & II; repeated references to "hostile work environment")).) In support of his claim, Hurd has presented a substantial amount of evidence suggesting that Defendants took multiple adverse actions against Hurd as a result of his complaints and NEOC/EEOC Charges—the imposition of several forms of discipline, such as reprimands, warnings, and suspension of his ability to perform certain medical procedures; changes in Hurd's shift and station assignments; requiring Hurd to perform a disproportionate amount of work on medic ambulance units; and twice failing to promote him—events that may not be actionable on their own, but that combined to create an allegedly hostile work environment.

"[A] hostile work environment claim, by nature, constitutes a continuing violation," which allows the court to "consider background evidence from the pre-limitations period [which] may be relevant to illuminate whether [the plaintiff's] work environment during the limitations period was sufficiently hostile." *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1173 (8th Cir. 2001) (internal quotation marks and citations omitted). However, the court "may only examine such evidence if [the plaintiff] can also demonstrate evidence of a hostile working environment violation in the limitations period." *Id.* (internal quotation marks and citation omitted). *See also Betz v. Chertoff*, 578 F.3d 929, 937-38 (8th Cir. 2009) ("the continuing violation doctrine applies in hostile work environment claims, where, although one incident may not support a claim, the claim may be supported by a series of incidents that occur over a period of time").

In hostile-environment cases, the "unlawful employment practice" referred to in 42 U.S.C. § 2000e-5(e)(1) does not occur on any particular day; rather, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

It does not matter, for purposes of [42 U.S.C. § 2000e-5(e)(1)], that some of the component acts of the hostile work environment fall outside the statutory time period. *Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.*

. . . .

. . . Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment.

*Id*. at 117-18 (emphasis added).

Here, Hurd's allegations of retaliation occurring within 300 days preceding his second NEOC/EEOC Charge (filed September 11, 2015) include Hurd not being assigned to a EMS Supervisor or Backup EMS Supervisor role; Hurd's continual assignment to work more medic hours than others; Defendants' two failures to promote Hurd to Battalion Chief positions; Mayor Beutler's December 2014 letter to Hurd indicating that all disciplinary actions had been removed from Hurd's file and that LF&R management would examine the fire-training academy, would undergo mandatory training regarding equal-employment practices such as retaliation, and would review the process of imposing discipline to ensure that discipline is consistent; and Casady's May 21, 2015, letters of "exoneration" to Borer, Pashalek, and Huff regarding the Hurd investigation. All of these allegations "occur[red] within the filing period" and "contribut[e] to the claim" of retaliation; therefore, the court may consider "the entire time period of the hostile environment . . . for the purposes of determining liability." *Morgan*, 536 U.S. at 117. Specifically, it is permissible to "consider background evidence from the pre-limitations period [which] may be relevant to

51

illuminate whether [the plaintiff's] work environment during the limitations period was sufficiently hostile." *Smith*, 250 F.3d at 1173.

Hurd's many allegations of ongoing retaliation in his Amended Complaint—whenever they occurred—are the same type of retaliation alleged in his timely-filed second NEOC/EEOC Charge, which specifically noted that Hurd was asserting a "continuing action." (Filing No. 108-19.) Hurd hinted as early as his first NEOC/EEOC Charge that his hostile-work-environment retaliation claim involved a series of incidents that had occurred over a period of time and were likely to continue into the future. (Filing No. 108-16 ¶ 10 (Hurd's first NEOC/EEOC Charge alleging that he was "now the target of future reprisal by the Respondent").)

Therefore, although some of the acts on which Hurd's claim is based may have occurred outside of the 300-day period preceding Hurd's September 11, 2015, second NEOC/EEOC Charge, they are still "part of the same actionable hostile environment claim" because "at least one act [fell] within the time period" and will be considered for the purposes of determining liability. *Morgan*, 536 U.S. at 121-122; *see also Wedow*, 442 F.3d at 674 (court would consider allegations of retaliation in judicial complaint that were of the same type of ongoing retaliation alleged in timely filed administrative charges when EEOC charges alleged that retaliation had occurred and would continue to occur in the future; forcing plaintiffs to file new administrative charges "with each continuing incident of discrimination would create needless procedural barriers").

## IV. CONCLUSION

Defendants' Motion for Summary Judgment shall be granted as to Count I ("Retaliation Under 42 U.S.C.A. § 1983"), Count II ("Equal Protection Violation"), and Count III ("Conspiracy Under Section 1983"), but shall be denied as to Count IV (Title VII) and Count V (Nebraska Fair Employment Practice Act). The latter two claims may proceed only against the City of Lincoln, which is Hurd's "employer"

within the meaning of the relevant acts. *See* 42 U.S.C. § 2000e-2(a) (Title VII imposes liability only on "employers"); 42 U.S.C. § 2000e(b) (defining "employer"); Neb. Rev. Stat. § 48-1102(2) (defining "employer"); *Davis v. Ricketts*, 765 F.3d 823, 826 (8th Cir. 2014) ("Title VII imposes liability for employment discrimination only on an 'employer.'"). Final judgment on Counts I, II, and III shall be withheld until Counts IV and V are resolved.[32]

Accordingly,

IT IS ORDERED:

1.      Defendants' Motion for Summary Judgment (Filing No. 107) is granted as to Count I ("Retaliation Under 42 U.S.C.A. § 1983"), Count II ("Equal Protection Violation"), and Count III ("Conspiracy Under Section 1983"), and such claims are dismissed with prejudice.

2.      Defendants' Motion for Summary Judgment (Filing No. 107) as to Plaintiff's's retaliation claims under Title VII and the Nebraska Fair Employment Practice Act (Counts IV and V) is denied.

3.      Remaining for disposition in this action are Plaintiff's claims under Title VII and the Nebraska Fair Employment Practice Act (Counts IV and V) against his employer, the City of Lincoln, alleging that the City retaliated against him by creating and perpetuating a hostile work environment because Plaintiff complained about the City's sexual and national-origin harassment of a fellow employee and because

---

[32]While the Court of Appeals would have jurisdiction over a defendant's interlocutory appeal from an order *denying* the defendant's motion for summary judgment based on qualified immunity under the collateral order doctrine, "[t]he collateral order doctrine does not apply . . . when a party complains that the district court should not have *granted* summary judgment based on qualified immunity." *Coleman v. Parkman*, 349 F.3d 534, 537 (8th Cir. 2003) (emphasis in original).

Plaintiff filed charges with the NEOC/EEOC.

4.      Final judgment shall not be entered on Counts I, II, and III until Counts IV and V are resolved.

5.      Pursuant to Magistrate Judge Zwart's prior Order (Filing No. 130), counsel shall contact Judge Zwart's chambers to reschedule the pretrial conference and trial.

DATED this 23rd day of July, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge