IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TROY M. HURD, | ) | Case No. 4:16-cv-03029 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF** |
| | ) | **DEFENDANT CITY OF LINCOLN'S** |
| THE CITY OF LINCOLN, a political | ) | **MOTION TO EXCLUDE** |
| subdivision, TOM CASADY, JOHN HUFF, | ) | **PLAINTIFF'S PROPOSED EXPERT** |
| PAT BORER, ROGER BONIN, JEANNE | ) | **TESTIMONY/OPINIONS BY** |
| PASHALEK, and LEO BENES, in their | ) | **AMY OPPENHEIMER** |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Defendant City of Lincoln ("Defendant") moves the Court for an Order excluding the testimony/opinions of Plaintiff's proposed expert witness Amy Oppenheimer. (Doc. #115-1); (Doc. #115-2); (Doc. #115-3). Defendant brings this motion pursuant to *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993) and its progeny, Fed. R. Evid. 702, and NECivR 7.1.

## FACTUAL BACKGROUND

Defendant describes the pertinent facts of this lawsuit in its Statement of Material Facts within its Brief in Support of Motion for Summary Judgment, which facts are incorporated herein by this reference (Doc. #109, at CM/ECF p. 1-19, ¶¶ 1-90); however, facts specific to the present motion are included here.

1.  Plaintiff was asked to assist Firefighter Lloyd "Eddie" Mueller with the recruit training academy for fire suppression skills beginning on or about September 7, 2011. Mueller was in charge of the recruit academy and had been in charge of three (3) other recruit academies before Plaintiff's assignment. This was the first and only recruit academy in which Plaintiff was

1

a primary instructor. (Doc. #108-7, at CM/ECF p. 1-2, ¶¶ 3-4); (Doc. #108-13, at CM/ECF p. 1-2, ¶¶ 3-4); (Doc. #108-6, at CM/ECF p. 1, ¶ 5); (Doc. #18, at CM/ECF p. 2, ¶ 12).

      2.     Plaintiff made complaints to Roger Bonin as the Division Chief of Training regarding some of Mueller's training of the recruits in a para-militaristic style and the organization of the training, which included a typed statement he provided to Bonin in November 2011. (Doc. #108-7, at CM/ECF p. 2, ¶¶ 6-7); (Doc. #108-6, at CM/ECF p. 2, ¶ 6); (Doc. #108-6, at CM/ECF p. 8-6); (Doc. #21, at CM/ECF p. 2, ¶ 6).

      3.     During the recruit academy, Plaintiff did not make complaints about Mueller discriminating or treating firefighter trainee Sara Khalil or any of the other recruits differently because of their gender or national origin. His typed statement to Roger Bonin involves complaints about Mueller, not complaints of discrimination. (Doc. #108-13, at CM/ECF p. 2, ¶¶ 8, 10); (Doc. #108-6, at CM/ECF p. 2, ¶ 6); (Doc. #108-6, at CM/ECF p. 8-9); (Doc. #108-14, at CM/ECF p. 3, ¶ 14).

      4.     Khalil did not make any complaints to anyone on LF&R's command staff or the City of Lincoln that she was experiencing discrimination based on her national origin or gender. (Doc. #108-7, at CM/ECF p. 2, ¶ 12); (Doc. #108-13, at CM/ECF p. 2, ¶ 10); (Doc. #108-14, at CM/ECF p. 3, ¶ 13); (Doc. #108-5, at CM/ECF p. 3, ¶ 12).

      5.     On or about January 17, 2012, Plaintiff met with Roger Bonin and Battalion Chief Jeanne Pashalek regarding his complaints about the recruit academy and Mueller. His complaints involved rumors he believed Mueller was spreading about him within LF&R, as well as how Mueller, as the lead instructor, handled the recruit training academy. Based on Plaintiff's verbal statement and the content of both written statements, Pashalek understood his complaint to be about Mueller and the recruit academy generally, *not* that any recruit was treated differently

because of his or her protected status. (Doc. #108-5, at CM/ECF p. 2-3, ¶¶ 9-10); (Doc. #108-5, at CM/ECF p. 7-15); (Doc. #18, at CM/ECF p. 4, ¶ 24); (Doc. #18, at CM/ECF p. 2, ¶ 8).

6. Due to her role as the Human Resources Officer of LF&R, Pashalek conducted an investigation after that meeting. Pashalek did not interview Khalil, because Plaintiff mentioned her only once in his 9-page statement and did not indicate that Mueller's alleged poor treatment of her was based on any protected status. Pashalek did speak to other female recruits as part of her investigation. (Doc. #108-5, at CM/ECF p. 3, ¶ 11); (Doc. #108-5, at CM/ECF p. 7-15); (Doc. #108-6, at CM/ECF p. 2, ¶ 10).

7. Based on Pashalek's investigation, she concluded that Plaintiff's allegations regarding Mueller and his alleged mishandling of the recruit academy were not corroborated by the witnesses. She believed that the root of the problem was a personal conflict between Mueller and Plaintiff and arranged for a face-to-face meeting between the two, to be attended by members of command staff, to address the conflict between Plaintiff and Mueller. (Doc. #108-5, at CM/ECF p. 3, ¶ 13); (Doc. #108-5, at CM/ECF p. 4-17).

8. On or about January 30, 2012, a meeting was held, facilitated by Assistant Chief Patrick Borer, which included Plaintiff, Pashalek, Benes, and Mueller, in order to resolve the issues between Plaintiff and Mueller. (Doc. #108-5, at CM/ECF p. 3, ¶ 14); (Doc. #108-13, at CM/ECF p. 2, ¶ 12); (Doc. #108-4, at CM/ECF p. 1, ¶ 3); (Doc. #108-7, at CM/ECF p. 2-3, ¶ 10); (Doc. #18, at CM/ECF p. 4, ¶ 26); (Doc. #21, at CM/ECF p. 2-3, ¶ 9).

9. At no time during this meeting did Plaintiff say that Mueller was mistreating any recruit based on his or her gender or national origin. The meeting did reveal the conflict between Mueller and Plaintiff and the history of their business together. (Doc. #108-7, at CM/ECF p. 2, ¶ 10); (Doc. #108-7, at CM/ECF p. 10); (Doc. #108-13, at CM/ECF p. 2-3, ¶ 12); (Doc. #108-5, at CM/ECF p. 3-4, ¶ 15); (Doc. #108-4, at CM/ECF p. 1-2, ¶ 4).

3

10. Because of Plaintiff's unacceptable behavior during the meeting, on February 28, 2012, Plaintiff received a written reprimand initiated by Pashalek for insubordination for leaving the meeting early. (Doc. #108-5, at CM/ECF p. 3-4, ¶ 15); (Doc. #108-5, at CM/ECF p. 20; (Doc. #18, at CM/ECF p. 4, ¶ 30); (Doc. #21, at CM/ECF p. 3, ¶ 11).

11. On March 2, 2012, Plaintiff met with Fire Chief John Huff, Dave Engler of the LF&R Union, and Human Resources Coordinator Pat Kant to discuss said written reprimand. Plaintiff continued to reiterate his irritation at how the recruit academy was run by Mueller. Plaintiff and Mueller's conflict appeared to be connected with the dispute with the outside business that Plaintiff took personally. However, he did not make any complaints at the meeting that Khalil was experiencing discrimination or that he was experiencing retaliation. (Doc. #108-3, at CM/ECF p. 2, ¶¶ 6-7); (Doc. #108-11, at CM/ECF p. 1-2, ¶ 3); (Doc. #18, at CM/ECF p. 5, ¶ 32); (Doc. #21, at CM/ECF p. 3, ¶ 13).

12. On August 8, 2012, after receiving the EIR for the improper hose test, Plaintiff filed an internal equal employment opportunity complaint with City's EEO Officer Kimberly Taylor-Riley alleging retaliation for his complaints about the recruit academy. (Doc. #108-5, at CM/ECF p. 4, ¶ 16); (Doc. #18, at CM/ECF p. 6, ¶ 41).

13. On September 5, 2012, Plaintiff filed his first (1st) Charge with the Nebraska Equal Opportunity Commission ("NEOC") against the City of Lincoln. (Doc. #108-16); (Doc. #18, at CM/ECF p. 7, ¶ 42); (Doc. #21, at CM/ECF p. 4-5, ¶ 20).

14. On January 30, 2013, the NEOC issued its determination of no reasonable cause on Plaintiff's first (1st) Charge, giving him ninety (90) days to file an action in state court. (Doc. #108-17); (Doc. #21, at CM/ECF p. 4-5, ¶ 20).

15. On October 10, 2014, more than two (2) years after the initial complaint, Taylor-Riley completed her investigation and report on the EEO complaint. (Doc. #18, at CM/ECF p. 8, ¶ 50); (Doc. #21, at CM/ECF p. 4, ¶ 23).

16. On September 11, 2015, Plaintiff filed his second (2nd) Charge with the NEOC. (Doc. #108-19); (Doc. #18, at CM/ECF p. 2, ¶ 9); (Doc. #18, at CM/ECF p. 11, ¶ 65).

17. On March 16, 2016, the NEOC filed its Administrative Dismissal, at Plaintiff's request, on the second (2nd) Charge. (Doc. #108-20).

18. Brian Giles, a LF&R employee represented by Plaintiff's counsel, filed a charge with the Nebraska Equal Opportunity Commission (NEOC) on June 8, 2016. The NEOC issued a "no reasonable cause" determination on Giles' charge on January 19, 2017. (Doc. #127-7).

19. Amanda Benson, another LF&R employee represented by Plaintiff's counsel, filed a charge with the NEOC on August 15, 2016. The NEOC issued a "no reasonable cause" determination on Benson's charge on March 28, 2018. (Doc. #127-8).

20. Plaintiff has hired Amy Oppenheimer as an expert whom he intends to call as a witness at trial. According to her report, Plaintiff hired Oppenheimer to offer her opinion "of the defendants' actions in response to complaints of workplace discrimination, harassment and retaliation, including what is considered typical and acceptable human resource practice in regard to responding to and investigating such complaints." (Doc. #115-13, at CM/ECF p.1, ¶ 1).

## DISCUSSION

**A.   Standard for admissibility of expert opinion evidence.**

Expert testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.* 509 US 579, 589, 113 S. Ct. 2786 (1993). The proponent of the expert testimony bears the burden of demonstrating by a preponderance of the evidence that it is admissible. *Id.* Under Rule 702 of the Federal Rules of Evidence, expert witnesses may testify in the form of an opinion if

5

the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issues. The testimony must be based on sufficient facts or data and be the product of reliable principles and methods that the expert relied upon to reach her opinion. *Id.* "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Scroggin v. Wyeth (In re Prempro Prods. Liab. Litig.)*, 586 F.3d 547, 565 (8th Cir. 2009) (quoting *Unrein v. Timesavers, Inc.,* 394 F.3d 1008, 1011 (8th Cir. 2005)). The trial court acts as the "gatekeeper" by determining if the expert's proffered testimony meets Rule 702 standards and must exclude opinion testimony that is irrelevant and unreliable. *Kumho Tire Co., v. CarmichaelI,* 526 U.S. 137, 147-148 (1999).

The Court may apply a number of non-exclusive factors in determining whether proposed testimony is reliable, including: "whether the theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; the known or potential rate of error; whether the theory has been generally accepted; whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Klein v. TD Ameritrade Holding Corp.*, No. 8:14CV396, 2018 U.S. Dist. LEXIS 38771, 5-6 (D. Neb. Mar. 7, 2018) (citing *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686-687 (8th Cir. 2001)). "The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence." *Id.*

**B.    Oppenheimer's testimony does not rest on a reliable foundation.**

"[E]xpert testimony should [only] be admitted if it is based on sufficient facts, it is the product of reliable methods and principles, and the witness has applied those methods reliably to the facts of the case." *United States v. Vessey*, 338 F.3d 913, 917 (8th Cir. 2003) (internal quotation omitted). Here, Oppenheimer's opinion about Defendant's response to Plaintiff's

6

complaints is not based on sufficient facts. Her opinion, it follows, is not the product of application of sufficient facts to reliable methods and principles.

Oppenheimer reviewed a variety of biased or incomplete materials to form her opinion that Defendant breached some "standard of care" (Doc. #115-13, at CM/ECF p. 5, 8), a concept regularly used in negligence cases but foreign to employment civil rights cases, in its response to Plaintiff's complaints. These materials included: Plaintiff's Complaint and Jury Demand, Plaintiff's NEOC Charges, Brian Giles' NEOC Charge, Amanda Benson's NEOC Charge, Taylor-Riley's report, the deposition of Taylor-Riley, and summaries of the depositions of Plaintiff, Tim Linke, Doug McDaniel, Jeanne Pashalek, John Huff, Tom Casady, Roger Bonin, and Pat Borer. Oppenheimer also reviewed 202 deposition exhibits, all but 29 of which were offered by Plaintiff. (Doc. #115-13, at CM/ECF p. 4-5). Oppenheimer does not appear to have reviewed the Amended Complaint (Doc. #18), Defendants' Answer to Amended Complaint, (Doc. #21), or any of the summary judgment briefs, affidavits, and evidence. (Doc. #115-13, at CM/ECF p. 4). Oppenheimer has reviewed the full deposition of Kimberly Taylor-Riley, but only summaries of others. (*Id.*)

Oppenheimer reveals, in a footnote, that she reviewed summaries of deposition transcripts, prepared by an associate, rather than the actual deposition transcripts. (Doc. #115-13, at CM/ECF p. 4, n.1). Oppenheimer does not name the associate, or identify the associate's experience with civil rights employment law, or the associate's experience taking or defending depositions. Oppenheimer does not provide a copy of the summaries, so there is no way for Defendant or the Court to know what those summaries contain. Do the summaries note Defendant's counsel's objections on the record? Did the associate provide context for statements made by deponents during the deposition? Were the statements provided in the depositions consistent throughout, or did the deponents provide different answers depending on how the

7

question was asked?  What questions, exactly, preceded the deponent's statements?  There are no answers to these questions, because the summaries are not part of the record.  Moreover, because Oppenheimer did not read the deposition transcripts, there is also no way to know if she considered whether any of the more than 200 exhibits were authenticated. Oppenheimer does not state that she reviewed any of the affidavits offered by deponents on summary judgment. Her understanding of their testimony therefore is limited exclusively to statements elicited by Plaintiff and does not include under-oath statements elicited by Defendant's counsel.

Oppenheimer reviewed Plaintiff's NEOC complaints and Taylor-Riley's investigation, but, curiously, did not review the NEOC's investigative files or determination letters. On Plaintiff's first charge, the NEOC determined there was no reasonable cause to believe Plaintiff suffered illegal retaliation. (Doc. #108-17). Plaintiff's second charge was administratively closed prior to determination, at Plaintiff's request. (Doc. #108-20). The NEOC investigators are experts on employment discrimination and retaliation, but Oppenheimer is not interested in their professional conclusions – which were made in much closer temporal proximity to the alleged retaliation than Taylor-Riley's investigation. Oppenheimer provides no explanation whatsoever for why she reviewed Benson's and Giles' NEOC charges or why she would rely on those charges to reach an opinion in the present case, as the evidence from those cases are irrelevant to Plaintiff's claims as determined by the Court's Memorandum and Order on summary judgment. (Doc. #136, at CM/ECF p. 2, fn 3). The NEOC also investigated the Benson and Giles allegations and found no reasonable cause to believe either was the victim of unlawful retaliation or discrimination by any of Defendants. (Doc. #127-7); (Doc. #127-8). In similar fashion to her review of the Hurd matter, Oppenheimer did not review the Benson and Giles NEOC investigative files or determinations.

Perhaps most concerning is the fact that Oppenheimer could not be bothered to read the Defendants' Answer to Plaintiff's Amended Complaint (Doc. #21) in this case. Oppenheimer quite obviously is not interested in forming an unbiased opinion, based on readily available materials. That she did not make even a cursory review of Defendant's position in this matter is evidence of the unreliability of her methods and supports exclusion of her opinion testimony.

Because the materials Oppenheimer reviewed are either secondary records (the deposition summaries) or heavily biased in Plaintiff's favor, she reaches factual conclusions that are, at a minimum, highly disputed, and at times wholly unsupported by the record. For example, Oppenheimer assumes throughout that Plaintiff's first complaints to Pashalek in late 2011 and early 2012 were unquestionably complaints of gender discrimination and Pashalek's investigation was insufficient. (Doc. #115-13, at CM/ECF p. 5, 7, 8). Pashalek's interpretation of Plaintiff's complaints was that they were about the recruit class generally, involving incidents allegedly impacting nearly all of the recruits, and not about illegal discrimination. (Doc. #108-5, at CM/ECF p. 2-3, ¶10); (Doc. #108-5, at CM/ECF p. 7-14). Oppenheimer summarily concludes Plaintiff complained about illegal discrimination without exploring the conflicting evidence on this key issue, including that Khalil is barely mentioned in the written complaints by Plaintiff.

Oppenheimer lays out a myriad of activities that she contends qualifies her as an expert in the area of employer response to complaints of retaliation or discrimination. (Doc. #115, at CM/ECF p. 1-4). What Oppenheimer lacks is experience or education with respect to municipal employers and complaints of discrimination by employees who are represented by labor unions and whose employment relationship is largely controlled by collective bargaining agreements. Oppenheimer's CV reveals a long history of testifying for plaintiffs in arbitrations, depositions and trials, but demonstrates no experience or expertise in the area of municipal governance, constitutional obligations of municipal employers, or the unique issues arising in employment

9

relationships governed by collective bargaining agreements. Oppenheimer's report indicates she did not read the collective bargaining agreements in effect when the events in this case occurred. Because Oppenheimer's opinion relies upon biased or incomplete information that is wholly insufficient, her testimony at trial should be excluded.

**C.      Oppenheimer's opinion is irrelevant to Plaintiff's claims and Defendant's defenses.**

Even if Oppenheimer's opinion was reliable, her opinion is not admissible because it is not helpful to the jury in understanding or determining a fact in issue. Fed. R. Evid. 702(a) "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591. Plaintiff seeks to offer Oppenheimer's opinion about Defendant's conformance with "typical and acceptable human resource practice," but nowhere identifies why the jury must make any finding at all on that issue to determine if there was actionable retaliation taken against Plaintiff.

Whether or not Defendant's actions in response to Plaintiff's complaints were typical or acceptable human resources practice is not relevant to any of the elements of Plaintiff's Title VII, or NFEPA unlawful retaliation claims.[1] To succeed on any of his statutory retaliation allegations, Plaintiff must either offer direct evidence of retaliation or establish a prima facie case of retaliation by demonstrating that (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to his protected conduct. *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). See also *Knapp v. Ruser*, 297 Neb. 639, 663, 901 N.W.2d 31, 48 (2017) ("the same formulation applies to set forth a prima facie case of retaliation under [Neb. Rev. Stat.] § 48-1114 as with the formulation of a prima facie case in a retaliation claim by the Eighth Circuit").

---

[1] Counts I, II and III of Plaintiff's Amended Complaint based on retaliation under 42 U.S.C. § 1983, equal protection violations, and conspiracy under 42 U.S.C. § 1983, respectively, were properly dismissed on summary judgment by the Court's Memorandum and Order. (Doc. #136, at CM/ECF p. 53). The remaining claims, Counts IV and V, under Title VII and the Nebraska Fair Employment Practice Act are still pending against Defendant City of Lincoln alone, not the individual Defendants.

If the plaintiff successfully establishes a prima facie case, he then must show that the defendants' proffered explanation for their conduct is pretext for retaliation. *Stuart v. General Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000). None of prima facie or pretext elements require any demonstration that the employer's investigation into the employee's complaints did not meet some "standard of care" in the field of human resources. (Doc. #115-13, at CM/ECF p. 5). None of the opinions offered by Oppenheimer will help the jury understand the facts of this case or the application of those facts to the law.

Oppenheimer's report references the *Ellerth-Faragher* defense. (Doc. #115-13, at CM/ECF p. 6).[2] *Ellerth-Faragher* is an affirmative defense available to employers to avoid vicarious liability for a supervisor's actionable sexual or racial harassment of employees. *Gordon v. Shafer Contracting Co., Inc.* 469 F.3d 1191, 1195 (8th Cir. 2006). This is not a harassment case. This is a retaliation case wherein Plaintiff alleges he was subjected to a number of discrete adverse actions. (Doc. #18). Plaintiff does not allege he was harassed. (Doc. #18) If Oppenheimer had read the Defendants' Answer in this case, she would know that Defendant has not raised an *Ellerth-Faragher* defense or otherwise asserted that the internal investigations into Plaintiff's complaints somehow shield the Defendant from liability. (Doc. #21). In fact, Defendant expects testimony at trial to reflect that certain employees of the City of Lincoln did not agree with the conclusions of the investigation or the manner in which it was conducted, which is acknowledged in Oppenheimer's report. (Doc. #115-13, at CM/ECF p. 12). Oppenheimer's opinion, therefore, is not only unreliable, but irrelevant to any of Defendant's affirmative defenses.

---

[2] Oppenheimer's report also mentions California State Court decisions, which are of no precedential value to this Court. (Doc. #115-3 at CM/ECF p. 7).

**D.    Any probative value of Oppenheimer's opinion is outweighed by the danger of unfair prejudice.**

When evaluating the admissibility of an expert's opinion, *Daubert* insists that the Court "should also be mindful of other applicable rules," like Fed. R. Evid. 403, which allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Because Oppenheimer's opinion is not directly relevant to any elements of Plaintiff's claims or Defendant's defenses, its probative value is undefined and negligible.  If the quality of the investigations into Plaintiff's complaints is tenuously relevant to this case, an expert opinion is not required to assist the jury in understanding the investigations.

"Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value.  On the other hand, the risk of unfair prejudice is real." *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 18 (1st Cir. 1997). Presumably, every juror empaneled will be employed or was employed at some time in his or her life. Expert testimony on the issue of human resources investigations will not assist the jury given the common knowledge the average layperson has from being an employer or employee.  If allowed to testify, Oppenheimer's "opinions" about the investigation might serve to improperly implant legal conclusions in the minds of the jury about City's culpability due to its employees' actions surrounding the investigation, when it is the providence of the jury alone to review the facts and decide if the elements of a prima facie case were established on Plaintiff's claims of retaliation.  Oppenheimer's critique would do nothing more than prejudice, mislead, and confuse the jury.

## CONCLUSION

For the reasons set forth above, Defendant City of Lincoln respectfully requests an order prohibiting Amy Oppenheimer from testifying at trial and prohibiting Plaintiff, his counsel, and any witness from referencing Oppenheimer's testimony, reports, or conclusions.

DATED: September 7, 2018.

        CITY OF LINCOLN, Defendant

        JEFFERY R. KIRKPATRICK, City Attorney
        JOCELYN W. GOLDEN, Assistant City Attorney
        ABIGAIL F. LITTRELL, Assistant City Attorney

By: */s/ Abigail F. Littrell*
    Abigail F. Littrell, #24423
    Jocelyn W. Golden, #23039
    555 South 10th Street, Suite 300
    Lincoln, NE 68508
    (402) 441-7281
    alittrell@lincoln.ne.gov
    jgolden@lincoln.ne.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. The foregoing document was sent electronically to:

Kelly K. Brandon, kelly@employmentlawnebraska.com
Paige Fiedler, paige@employmentlawnebraska.com
Stephanie Costello, stephanie@employmentlawnebraska.com

        By: */s/ Abigail F. Littrell*
            Abigail F. Littrell, #24423