IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TROY M. HURD,<br><br>     Plaintiff,<br><br>vs.<br><br>CITY OF LINCOLN, a political subdivision,<br><br>     Defendant. | Case No. 4:16CV3029<br><br><br>**PLAINTIFF'S REPLY BRIEF TO DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY FEES AND EXPENSES** |

COMES NOW the Plaintiff, Troy M. Hurd, and submits the following Reply Brief to Defendant's Brief in Opposition to his Motion for Attorney Fees and Expenses.

## I.   PAIGE FIELDER'S RATE IS REASONABLE GIVEN HER EXPERTISE IN EMPLOYMENT LAW, THE COMPLICATED ISSUES PRESENTED, THE NUMBER OF ATTORNEYS THAT WERE EMPLOYED BY DEFENDANT

Defendant takes issue with Paige Fiedler's rate of $475.00/hour.  If the Court reviews Ms. Fielder's resume, which is certainly impressive, its content does not begin to cover her extensive trial experience, which was on full display during this trial.  Ms. Fielder has handled well over 2,000 employment law and civil rights cases and tried 35 of them.  Her record of success in employee civil rights litigation is unparalleled.  (Filing No. 254-10 and 254-13)  Civil rights cases, especially one that spans several years, are complicated and require knowledge of many evidentiary issues, as well as, legal precedent.  Ms. Fiedler is a walking encyclopedia of knowledge regarding civil rights law and is one of several preeminent attorneys rewriting the Iowa jury instructions regarding employment law. (Filing No. 254-1 at 2) She's been honored by the Iowa Trial Lawyers Association Public Justice Award for establishing right to trial by jury under the Iowa Civil Rights Act.  (Filing No. 254-1 at 7)

Plaintiff agrees that Ms. Fiedler's hourly rate is higher than many other Nebraska attorneys with similar years of experience.   If she had below-average skills, however, she would not be entitled to the same hourly rate as a Nebraska lawyer with the same number of years in practice. By the same token, because she does an outstanding job representing workers in employment law matters, she is entitled to an above-average rate. "An attorney's brilliant insights and critical maneuvers sometimes matter far more than hours worked or years of experience," and those qualities should be reflected in the hourly rate. *Perdue v. Kenny A*, 559 U.S. 542, 555 n.5 (2010).

> Some factors which make one attorney worth more than another—such as academic credentials and years of experience—are either reducible to paper or apparent to a trial judge. But others—such as the ability to communicate with clients, efficiency, judgment, and personality—are not so easily reduced or quantified.

*Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 19 (D.C. Cir. 1984).

The Supreme Court of the United States have made it clear that attorneys must be compared to "lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). "[L]awyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court." *Gusman v. Unysis Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993).

> [J]ust because the proffered rate is higher than the local rate does not mean that a district court may freely adjust that rate downward. When a local attorney has market rates that are higher than the local average, "[a] judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community."

*Mathur v. Board of Tr. of S. Ill. Univ.*, 317 F.3d 738, 743-44 (7th Cir. 2003) (quoting *Gusman*, 986 F.2d at 1151).

2

Although the hourly rate charged by Paige Fiedler is higher than average, it is hardly unprecedented. Roxanne Conlin is the most preeminent civil rights lawyer in the State of Iowa. She charges and receives $940 per hour.[1]

St. Louis Attorney Jerome Dobson has submitted an Affidavit stating: "Ms. Fiedler has a national reputation among the employment bar for her exceptional trial skills, her accomplishments as a trial lawyer and her willingness to fight fearlessly for the rights of her clients, often in the face of seemingly overwhelming odds. **She is highly respected as one of the foremost plaintiff's employment lawyers in the United States.**" Dobson Aff. ¶ 10 (emphasis added).

Roxanne Conlin writes: "**Ms. Fiedler is simply the best employment law attorney in the State of Iowa.** No one else has achieved such consistently excellent results for her clients over such a long period of time." Conlin Aff. ¶ 9 (emphasis added).

Back in 2005, Judge Robert Pratt praised Ms. Fiedler's outstanding resume, trial preparation skills, and experience with employment discrimination litigation. *Hite v. Vermeer Mfg. Co.*, 361 F. Supp. 2d 935, 953 (S.D. Iowa 2005). The Court stated it had "no doubt that the expertise of [plaintiff's] lawyers played a substantial role" in the plaintiff's victory. *Id.*

The same is true here. Plaintiff asks the Court to find Ms. Fiedler's services are worth the $475 per hour that she typically bills and receives.

Defendant's use of two attorneys and a paralegal during every deposition, as well as, three attorneys and a paralegal during trial further bolsters reimbursing Ms. Fiedler at her standard

---

[1] 2 "Ms. Conlin enjoys a well-deserved reputation of national prominence in her field." Miller v. Woodharbor Molding & Millworks, Inc., No. C95-3079-MWB, Order Re: Plaintiff's Amended Fee Application, p. 11, n.6 (N.D. Iowa 4/24/98). "Ms. Conlin has repeatedly demonstrated to the court that she is a superb civil rights trial lawyer. In this court's view, her skill, knowledge, experience, reputation, and effort are simply unparalleled." Id.

hourly rate.  Without Ms. Fiedler's knowledge, Plaintiff would have been required to add an additional attorney to their brain trust to achieve the level of success that Plaintiff obtained at trial. If three attorneys were required at a conservative hourly rate of $275.00, that total of $825.00 far exceeds what Plaintiff's counsel's combined hourly rate is in this case of $775.00.

Plaintiff's fees are proportional to the defense asserted. The amount deemed reasonably necessary to litigate a case must take into account the vigor which one's opponent brings to the dispute. *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (holding a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response"). In large part, the time Plaintiff's lawyers expended was "within the defendants' control. Their strenuous and able opposition extracted more time and greater effort from plaintiff's counsel. Confronted with a claim of this nature, defendants may properly elect to fight hard. But if they do and lose, they must pay what the statute commands." *Starks v. Orleans Motors, Inc.*, 372 F. Supp. 928, 933 (E.D. La. 1974); *see also Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 610-11 (7th Cir. 2014). The "court should not reward defendants for their vehement "'Stalingrad' defense" by allowing them to escape responsibility for the fees necessary to meet that defense. *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998). Indeed, "a litigant's staffing needs and preparation time will often 'vary in direct proportion to the ferocity of her adversaries' handling of the case.'" *Id.* (quoting *Lipsett v. Blanco*, 975 F.2d 934, 939 (1st Cir. 1992)).

"[Defendants] wanted to fight and [their] wishes were carried out. The time has come to pay the fiddler. [Defendants have] listened to the music [they] ordered and should not be allowed to complain about paying the bill." *Munday v. Thielecke*, 290 S.W.2d 88, 92 (Mo. 1956).

The hourly rates of attorneys who undertake the risk of loss along with the client simply

must be higher than atto222222222222222222rneys who are paid in full every month. *See City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) (financial risk and delay in payment due to contingency fee must be taken into account in calculating lodestar).

> That defense counsel command a certain rate for their services when payment is insured and paid on a monthly basis does not tell us very much about what Title VII plaintiff's counsel consider reasonable compensation when they run the risk of getting absolutely nothing and when they will nearly always have to wait for their money. I for one, find it inconceivable that [defense counsel] would be content to have his contingent fees yield no greater profit than his hourly fees when he undertakes the risk of getting nothing and having to wait for his money, even if he wins.

*Griffin*, 172 F. Supp. 2d at 200. Plaintiff's attorneys have been working on this case since July of 2015 and not yet been paid a dime for their work.

The contingent nature of a fee agreement is also among the *Johnson* factors courts must consider in confirming the appropriate hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 898 (Iowa 1990). "Plaintiff's counsel took a substantial risk that no money would ever be recouped for their services in this case, as Plaintiff was under no obligation to pay counsel should her claim have failed in its entirety." *Hite v. Vermeer Mfg. Co.*, 361 F. Supp. 2d 935, 953 (S.D. Iowa 2005). Defendant ignores these important considerations by comparing Plaintiff counsel's rate.

Finally, Mr. Hurd sought out several firms prior to retaining Fiedler & Timmer, P.L.L.C. (Hurd Aff. ¶ 2) The Fiedler firm utilizes its staff of attorneys from both Nebraska and Iowa for the benefit of its clients. Without the assistance from Iowa counsel within the Fiedler firm, especially Ms. Fiedler, the Nebraska office would not have taken this case. (Brandon Aff. ¶ 30)

## II.   PLAINTIFF'S SUCCESS AS A WHOLE IS THE MEASURE TO DETERMINE THE REASONABLENESS OF THE FEE AWARD

### A.   APPLICABLE AUTHORITY

"The most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole." *Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997) (*en banc*). "If the plaintiff has won excellent results, he is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he did not win." *Id.* "If the plaintiff's success is limited, he is entitled only to an amount of fees that is reasonable in relation to the results obtained." *Id.*

"The question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990); *see also Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992) ("The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.").

In *Lewis v. Heartland Inns of America, L.L.C.*, 764 F. Supp. 2d 1037, 1045 (S.D. Iowa 2011), the defendant argued the plaintiff's attorneys' fees should be cut because she lost her discrimination claim, even though she won her retaliation claim. The court disagreed. *Id.* "Litigation is unpredictable and the mere fact that the jury ruled against Lewis on one of her claims does not mean that her attorneys failed her." *Id.* Her claims for discrimination and retaliation "were clearly related and the evidentiary bases for these claims were inextricably intertwined. Indeed, it is difficult to see how the evidence Lewis presented—or her attorneys'

6

trial preparation more generally—would have differed in any meaningful way if she had only brought a retaliation claim." *Id.* at 1046. Accordingly, the court ruled that her attorneys "should receive full compensatory fees for their work on this litigation as a whole." *Id.; see also Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009) (defendant required to pay all plaintiff's fees, even though she had voluntarily dismissed her retaliation claim before trial).

Fees on related matters are recoverable "because litigation is not an exact science." *Jordan v. City of Cleveland*, 464 F.3d 584, 604 (6th Cir. 2006).

> Lawyers cannot preordain which claims will carry the day and which will be treated less favorably. Good lawyering as well as ethical compliance often requires lawyers to plead in the alternative. Fee awards comport with that reality by giving full credit to a meaningful successful plaintiff, rather than making a mechanical per-losing-claim deduction from an attorney's fee award. *Id.* "Moreover, awarding fees for services connected with related claims, though the claims prove unsuccessful, 'supports the underlying purpose of . . . encouraging attorneys to take on civil rights actions in view of the ethical duty of zealous representation.'"

*Id.* n.25 (quoting *Goos v. Nat'l Ass'n of Realtors*, 68 F.3d 1380, 1386 (D.C. Cir. 1995)).

Courts should consider whether the plaintiff achieved a level of success that justifies the hours expended. *See Lee v. State,* 874 N.W.2d 631, 649 (Iowa 2016); *see also Partington v. Broyhill Furniture Indus.*, 999 F.2d 269, 273 (7th Cir. 1993) ("The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case."). In other words, was it worth the amount of fees and expenses to achieve the significant victory Troy Hurd achieved in this case of $1,177,815.43? A review of relevant case law suggests the answer is a resounding "yes."

The United States Supreme Court agrees. "Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards." *City of Riverside v. Rivera,* 477 U.S.

561, 575 (1986) "In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future." *Id.* "Because damage22 awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *Id.*

Thus, the *Rivera* Court affirmed the plaintiffs' attorney fee judgment for $245,456 (the full amount requested) after a jury awarded a total of $33,350 to be split among eight plaintiffs. *Id.* at 564-65. The Court found that limiting "attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting [fee shifting statutes]." *Id.* at 576; *see also Loggins v. Delo*, 999 F.2d 364, 368-69 (8th Cir. 1993) (affirming $25,000 in attorneys' fees to achieve underlying judgment of Constitutional violations worth $102.50).

The Supreme Court recognized that civil rights cases involving unrelated claims are "unlikely to arise with great frequency." *Hensley v. Eckhart*, 461 U.S. at 435. It is not necessarily significant that a plaintiff does not end up receiving all the relief she requests. *Id.* at 435 n.11. "For example, a plaintiff who failed to recover damages but obtained injunctive relief . . . may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." *Id.*

In light of this precedent, Plaintiff's success in securing a verdict of $1,177,815.43, and the public interest achievement undoubtedly make the attorney fees and expenses incurred in this case worthwhile.

Congress has expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit "'does so not for himself alone but also as a 'private attorney general,' vindicating a

policy that Congress considered of the highest importance." *Newman v. Piggie Park Enter.,
Inc.*, 390 U.S. 400, 402 (1968); *see also Rivera*, 477 U.S. at 575.  Since lawsuits like this one
"seek to vindicate important civil and constitutional rights that cannot be valued solely in monetary
terms, the benefit derived is not directly related to the damages recovered."  *See Rivera*, 477 U.S.
at 574.

Congress made successful civil rights plaintiffs' attorney fees recoverable from
defendants to further advance this public service.  *Newman*, 390 U.S. at 402.  To eliminate
obstacles to the private enforcement on which the vibrancy of our civil rights laws depend,
Congress decided to shift the full cost of enforcement to guilty defendants.

"The reason a successful civil rights litigant is entitled to attorney fees 'is to ensure that
private citizens can afford to pursue the legal actions necessary to advance the public interest
vindicated by the policies of civil rights acts.'" *Id.* (quoting *Ayala v. Center Line, Inc.*, 415 N.W.2d
603, 605 (Iowa 1987)).  To award fees solely in relation to the size of the judgment would not
appropriately compensate employees' attorneys for their "public interest achievement." *Lynch*, 464
N.W.2d at 239.

In *Lee v. State,* 874 N.W.2d 631 (Iowa 2016), the Iowa Supreme Court overturned an across
the board reduction of an attorney fee award because some of Plaintiff's claims were not successful
at trial.  The Court directed the trial court to consider the following when reviewing its fee award on
remand*,* "not only the significance of the success obtained to Lee personally, but also the degree to
which her core claim served to vindicate the public interest." *Lee III*, 874 N.W.2d at 649.

Based on Plaintiff's degree of success and the manner in which Troy Hurd's claims of
retaliation serve to vindicate the public interest, the Court should allow the maximum attorney's fees
and expenses award possible.

**B.      THE HOURS WORKED BY PLAINTIFF'S COUNSEL
         ARE COMPENSABLE**

**1.      Block Billing/Duplicative Work**

Defendants assert that Plaintiff's block billing entries should be denied or reduced because of lack of specificity and/or duplication. Block billing is not prohibited by any local rule in the United States District Court for the District of Nebraska. The entries are not general in nature by any means. Plaintiff's counsel endeavored to try and explain as much as possible during the trial of this case what they were doing. These entries are not the type of poor record-keeping that requires a reduction in fees as in the cases cited by Defendant. (Filing No. 302 at 6)

In *Ryan Data Exch., Ltd. v. Graco, Inc.,* 913 F.3d 726, 736 (8th Cir. 2019), the Court reduced the billing for reasons that are not present in this case. The Court in *Ryan Data* relied upon the following:

> Inability to discern separation between the infringement and contract claims, lack of sufficient billing records to precisely grasp the nature of work done, [Rydex's] success solely on a portion of the contract claim, the amount of the judgment in relation to amounts claimed, the complexity of the case which was essentially a straight forward contract dispute, and the Court's understanding of customary charges in the jurisdiction, in search of the 'reasonable attorney's fee' contemplated by the license Agreement.

*Id.* at 736. In *Miller v. Dugan*, 764 F.3d 826, 832 (8th Cir. 2014), involved "blocks of time billed by attorney Capron," not block billing. *Id.* at 832-833. The reductions were very specific to the work done by the attorney in that particular case. Fiedler & Brandon were specific on the tasks that each of them performed during the weeks leading up to and including the trial of this case. Both worked extremely hard to ensure the success of Troy Hurd. Contrary to Defendant's argument, block billing is not prohibited.

In the case of *Gilster v. Primebank, 884 F. Supp. 2d 811 (N.D. Iowa 2012),* the Court's local rules prohibited block billing. Even so, the Court only reduced the block billing entries by 3%, not

the 20% advocated by the Defendant.  The Court in *Bowen v. Allied Prop. & Cas. Ins. Co.,* No. 4:11CV3163, 2013 U.S. Dist. LEXIS 33174, at *22 (D. Neb. Mar. 11, 2013), did not order a 15% reduction for block billing.  The Court held that its overall 15% reduction regarding duplicative efforts and clerical tasks more than accounted for any potential reduction that should be allotted for other non-specific block-billing.  *Id.* at *6.  Plaintiff's counsel's efforts were not duplicative, nor are the small amounts billed by Plaintiff's counsel's staff clerical in nature.  (See section C. below)

The following attorneys and staff attended depositions in this case:

| **Deponent** | **Plaintiff** | **Defendant** |
| --- | --- | --- |
| Kimberly Taylor-Riley | Brandon | Golden, Littrell, Hansen-Richmond |
| John Huff I | Brandon & Fiedler | Golden, Littrell, Hansen-Richmond |
| John Huff II | Fiedler | Golden, Littrell, Hansen-Richmond |
| Doug McDaniel I | Brandon & Fiedler | Golden, Littrell, Hansen-Richmond |
| Doug McDaniel II | Fiedler | Golden, Littrell, Hansen-Richmond |
| 30(b)(6) | Brandon | Golden, Littrell, Hansen-Richmond |
| Pat Borer | Brandon | Golden, Littrell, Hansen-Richmond |
| Pat Borer II | Brandon | Golden, Littrell, Hansen-Richmond |
| Tom Casady I | Fiedler & Costello | Golden, Litrell, Hansen-Richmond |
| Tom Casady II | Fiedler | Golden, Littrell, Hansen-Richmond |
| Tim Linke | Brandon | Golden, Littrell, Hansen-Richmond[2] |
| Jeanne Pashalek | Fiedler | Golden, Littrell, Hansen-Richmond |
| Kendall Warnock | Fiedler | Golden, Litrell, Hansen-Richmond |

---

[2] Ms. Brandon neglected to enter time for preparation and attendance at the deposition of Tim Linke. My outline document for Chief Linke's deposition was created in Microsoft Word at 5:40 a.m. and was printed at 7:48 a.m.  Linke's deposition lasted 5 hours, and she spent 1.5 hours traveling to it, as well. That equals 8.5 hours at $300.00 that was not billed of $2,550.00.

11

| Deponent | Plaintiff | Defendant |
|---|---|---|
| Mayor Beutler | Fiedler & Brandon | Golden, Littrell, Elliott |
| Roger Bonin | Fiedler & Costello | Golden, Littrell, Hansen-Richmond |
| Trial | Brandon, Fiedler, Jahn | Golden, Littrell, Elliott and Leasure |

It seem disingenuous for defense counsel to argue that Plaintiff's counsel was engaging in duplicative work when at every single deposition that was taken and during the trial of this matter, they out-numbered Plaintiff's counsel and staff by one or two individuals.

**2.      Fees relating to Kimberly Taylor-Riley's Deposition/Interview**

Defendant questions the time Kelly Brandon spent preparing for the deposition of Kimberly Taylor-Riley, which included a total of fifty-three hours. Kimberley Taylor-Riley's file consisted of documents ranging from Bates-stamp numbers #6100 to #32000. A photo of the file was actually requested and produced in this litigation. (Exhibit 39) Ms. Taylor-Riley's extensive investigation into Troy Hurd's internal complaints of harassment and retaliation commenced in August, 2012 and ended in October, 2014. (Filing No. 135-1) Taylor-Riley interviewed over 35 witnesses and named 101 documents in her report that consisted of 110 pages. (Filing No. 135-1 at 2-5, 5-6, and 1-110)

Plaintiff's counsel originally traveled to Lincoln to review the file in the City's offices and then requested the portions of the file that she wanted scanned and copied. In addition to those records, the City also produced thousands of pages of email correspondence between Taylor-Riley and other individuals during the course of her investigation. Many of those emails were critical exhibits at the trial of this matter. (Brandon Aff. at ¶ 3)

Ms. Taylor-Riley's deposition was first deposition in this case. The deposition was seven hours long. During the course of the deposition, Plaintiff's counsel introduced 121 exhibits for the record, which were used throughout this case in other depositions of City representatives and at trial.

12

Ms. Taylor-Riley was one of the central figures in this litigation and made multiple admissions during the course of her deposition, which supported Plaintiff's claims of retaliation. The time spent preparing for her deposition was critical to Plaintiff's success in this case. (Brandon Aff. at ¶ 4)

Defendant questioned Ms. Brandon's trip to St. Charles, Missouri to meet with Ms. Taylor-Riley prior to trial. Following Ms. Taylor-Riley's resignation from the City, she obtained a position out of state. Plaintiff's counsel was unaware that she resigned from the City prior to her trip to Missouri. Furthermore, the Court's order denying Defendant's Motion for Summary Judgment was not entered in this matter until July, 2018. (Filing No. 136) Following the entry of that order, Ms. Brandon contacted defense counsel to ensure that they agreed that Plaintiff's counsel would not be breaching any ethical duties by contacting a former, supervisory employee of the City. (Brandon Aff. at 6, Ex. A)

Ms. Taylor-Riley was a key witness. Plaintiff's counsel's hourly work, travel time and related expenses were reasonable and necessary to prepare for the trial of this case.

### 3.     Summary Judgment Briefing/Post-Trial Motions

Defendant argues Plaintiff's summary judgment briefing was excessive because Defendant's briefing was 56% of Plaintiff's briefing on the motion for summary judgment in comparison to Plaintiff's briefing. Plaintiff has the burden of proof. Defendant submitted only Affidavits in support of their Motion for Summary Judgment even though there were eleven depositions taken and 218 exhibits introduced at those depositions. It was Plaintiff's duty to create the record for the Court on behalf of their client, so this matter could proceed to trial. Plaintiff's counsel was successful in that endeavor, and those fees should not be reduced.

Regarding post-trial briefing, Defendant claims that Plaintiff was not the prevailing party based on the Court's post-trial rulings. (Filing No. 302 at 3) This is simply not true. Defendant's

13

post-trial motions were all overruled, except on the limited issue of future emotional distress award. (Filing No. 294)  The Court did not overturn the jury's finding of liability or future emotional distress damages as a whole but did issue an Order of remittitur.  (Filing No. 294 at 18)  The Defendant then itemized virtually everything that Plaintiff's counsel has done post-trial and is requesting that the Court reduce Plaintiff's award by over $38,000. (Filing No. 301-7; Filing No. 298).

Plaintiff was entitled to equitable relief, and it would most certainly not be in the interest of Plaintiff to not request such relief.  Plaintiff respectfully disagrees with the Court's ruling on the relief that was not awarded, but Plaintiff should not be penalized for filing the Motion.  Again, Plaintiff's relief should be measured by Plaintiff's success as a whole – not piecemealed.  Although Plaintiff respectfully disagrees with the remittitur, Plaintiff's verdict was more than what the Court ultimately felt was reasonable in terms of a damages award.  Plaintiff's post-trial fees should not be reduced.

### 4.    Michael Leahy and Nate Borland

Mike Leahy is a former associate of Fiedler & Timmer, P.L.L.C.  Mr. Leahy graduated from Creighton Law School cum laude and on the law review.  He was Ms. Brandon's law school classmate.   His work experience includes being the head of the litigation department at Stinson, Morrison & Hecker; Vice President and General Counsel of Medico Insurance Company, and Associate General Counsel for Compliance at Creighton University.  (Brandon Aff. at ¶24)  Leahy was employed by Fiedler & Timmer, P.L.L.C. early on in this case and reviewed a substantial amount of documentation that Mr. Hurd brought to the firm at that time to guide our investigation (*Id.*)  Mr. Hurd's initial charge of discrimination had been filed and  determination rendered prior to retaining Plaintiff's counsel. Mr. Hurd accumulated documentation over a three-year timeframe prior to retaining Plaintiff's counsel. (*Id.*)

There is one-time entry from Nate Borland that is an error from October 11, 2016.  Otherwise,

Mr. Borland's time is compensable.  (Brandon Aff. at ¶ 25)

### 5.       Expert Witness Time

Defendant advocates for write-off of almost $70,000 for attorney time dedicated to working with Plaintiff's expert witnesses, John Bonta, M.D. ($16,894), Amy Oppenheimer ($37,990.65), and Rick McNeese, Ph.,D. ($16,019.50).  The Supreme Court has distinguished between taxable costs and expert fees, recognizing that the use of consultants is common in litigation.  *Taniguchi v. Kan Pac. Saipan,* Ltd., 132 S. Ct. 1997, 2006 (2012). "The court's power to tax costs under § 1920 is limited to the items enumerated in the statute." *Id.* The Supreme Court has cautioned that "[a]lthough 'costs' has an everyday meaning synonymous with 'expenses,' " ***taxable costs "are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators."*** *Id.* (emphasis added).

Time spent working with consultants and non-testifying experts is compensable, as well. *Interfaith Community Organization v. Honeywell Intern., Inc.,* 426 F.3d 694 (3rd Cir. 2005).  In *Interfaith,* the Court addressed whether the prevailing party should be entitled to expenses related to non-testifying consultant expert witness.  *The* Court observed:

> Experts are not only hired to testify; sometimes they are hired, also or instead, to educate counsel in a technical matter germane to the suit. The time so spent by the expert is a substitute for lawyer time, just as paralegal time is, for if prohibited (or deterred by the cost) from hiring an expert the lawyer would attempt to educate himself about the expert's area of expertise. To forbid the shifting of the expert's fee would encourage underspecialization and inefficient trial preparation, just as to forbid shifting the cost of paralegals would encourage lawyers to do paralegals' work.

*Id.* at 717.

The experts utilized in this case that did not end up testifying at trial were Mark Hannappel, Ph.D., Rick McNeese, Ph.D., Amy Oppenheimer, and John Bonta, M.D.  Mark

15

Hannappel was an early consulting expert that Plaintiff opted not to call at trial.  (Brandon Aff. at ¶¶ 12)  However, Plaintiff would have, time permitting, and if authorized by the Court called McNeese, Oppenheimer, and Bonta.  (Brandon Aff. at ¶¶ 13, 14, 16)

Dr. Bonta was consulted regarding the Rapid Sequence Intubation procedure and emergency management protocols in response to the Defendant's belated disclosure of Jason Kruger, M.D., as well as, several other witnesses named by the City as potential trial witnesses.  (Brandon Aff. at ¶13)  The following witnesses called by the City or Plaintiff testified regarding the RSI procedure or issues involving emergency management protocols:  1)  Roger Bonin, 2) Jamie Pospisil; 3) Jason Kruger, M.D.,  4) Nancy Christ, 5) Chris Jones, 6) Sara Khalil, 7) Craig Clark, 8) Greg Fisher, and 9) Peter Eppens.  Dr. Bonta, regardless of whether he was called at trial or not, assisted Plaintiff's counsel in preparing for these witnesses.  His report also went to these issues.  Just because the Court ultimately did not allow Dr. Bonta as a rebuttal witness does not mean the information and expertise he provided did not assist in the prosecution of this case. (*Id.*)

The fact that Plaintiff was unable to call Amy Oppenheimer or Rick McNeese, Ph.D. was not by choice.  Plaintiff fully intended on calling them.  The parties both agreed at the pretrial conference that they believed that they needed two to three additional days to present evidence in this matter.  But because of the Court's tight trial schedule, the Court was unable to accommodate that request.  Had the extra days of trial time been authorized, Plaintiff would have called Oppenheimer and McNeese.  The Court allowed both parties twenty hours of trial time.  Given the number of years and issues to cover in this case, Plaintiff unfortunately was not able to present all of their planned witnesses.

Amy Oppenheimer provided guidance and expertise regarding the Kimberly

Taylor-Riley investigation and was recognized by Judge Kopf as a witness that would be helpful to the jury.  (Filing No. 156 and 157)  Plaintiff intended to call Ms. Oppenheimer the week of February 11, 2019.  (Brandon Aff. at ¶ 14)  Oppenheimer's travel was booked; prep meetings were scheduled in Omaha, and Plaintiff intended on presenting her as a witness.  (Brandon Aff. at ¶ 14)

Due to the time constraints set by the Court, as well as, representations by defense counsel regarding their intention to call their damages expert witness, Terry Davis, Ph.D., Plaintiff's counsel made the difficult decision to cancel Ms. Oppenheimer's testimony to ensure proper time was reserved to cross-examined Dr. Davis.  (Brandon Aff. at ¶ 14) During trial, Defendant's counsel represented before trial that they intended to call Terry Davis, Ph.D. and continued to represent that they intended to call Dr. Davis throughout trial.  (*Id.*)  On February 14, 2019, the evening before the planned testimony of Dr. Davis, defense counsel represented that they would be calling Dr. Davis on February 15, 2019. (*Id.*)  The next morning on the 15th, Defendant's counsel represented that they intended to call Dr. Davis in the afternoon.  (*Id.*)  Ultimately, Defendant rested and did not call Dr. Davis at all.  (*Id.*)  Had defendant's counsel advised Plaintiff's counsel about their intention not to call Dr. Davis sooner, Plaintiff would have definitely called Ms. Oppenheimer in Plaintiff's case in chief. (*Id.*)   The decision to cancel her testimony and divert her travel plans back to California ultimately saved the City her time to prepare and testify at trial. (*Id.*)  Ms. Oppenheimer's knowledge and consult was critical in preparing for depositions, narrowing the issues regarding the investigation, and the overall strategy of Plaintiff's case on liability.

Rick McNeese, Ph.D. is Plaintiff's treating physician and was also retained as a

rebuttal expert by Plaintiff.  (Brandon Aff. at ¶ 16)  Plaintiff's counsel also planned to have him testify at the trial of this matter, however, with the limited time allocated for each side, Plaintiff's counsel had to choose which experts to utilize.  Ultimately, Plaintiff called Dr. Tellefsen who had reviewed Dr. McNeese's treatment.

All of these experts contributed necessary and extremely helpful expertise to Plaintiff's trial strategy.  Similar to the expert in *Argenyi v. Creighton University,* No. 8:09CV341, 2014 WL 1838980 n. 9, *8  (D. Neb. May 8, 2014), these attorney's fees and expert expenses were reasonably incurred.  In *Argenyi*, the expert was prohibited from testifying after the defendant withdrew a defense.  None of these witnesses were prohibited from testifying.  Plaintiff was just unable to call them because of time constraints.

Moreover, had Plaintiff's counsel attempted to research mental health disorders, rapid sequence intubation, or workplace investigations without the assistance of these experts, the attorney time would have far exceeded the time expended consulting with these subject matter experts.  But for the Court's order limiting the duration of the trial, Plaintiff would have called these witnesses.  Plaintiff also intends to call McNeese at the retrial of this matter on future emotional distress damages.  (Brandon Aff. at ¶ 16)

**6.    Travel time**

Defendant attached to its index of evidence a Mapquest printout for travel time to and from Plaintiff's counsel's office to downtown Lincoln at 3:09 p.m. for 40 minutes and from Plaintiff's counsel's office to downtown Omaha at 10:30 a.m for 20.7 miles.  Plaintiff's counsel's entries allow for 45 minutes each way to Lincoln and .3 or .4 for trips to downtown Omaha, both of which match Defendant's time estimates.  Furthermore, travel times vary due to the time of day, traffic, stops, and other factors.  Plaintiff's counsel's time billed for travel time is more than reasonable.

**C. HOURS WORKED BY PLAINTIFF'S COUNSEL'S STAFF ARE COMPENSABLE**

Defendant takes issue with the work performed by staff of Plaintiff's counsel's firm. (Filing No. 16-18) Successful civil rights litigants are entitled to reasonable costs, including paralegal fees at prevailing rates. *Richlin Sec. Service Co. v. Chertoff,* 553 U.S. 571, 577 (2008).

The following staff worked on this matter: Tracy McKibben, Donna Coltrane, Robin Jahn, Cheryl Smith, Ellen Kresha, Samantha Robb, and Stephanie Costello, when she served as a law clerk. Fielder Law Firm uses the term legal assistant and paralegal interchangeably. The work performed by these individuals in this case is not secretarial in nature.

From Tracy McKibben's date of hire in March of 2017 forward, she was included as an email recipient on the majority of the emails between counsel. As the Court can see on the firm's invoice, Ms. McKibben rarely, if ever, billed for her time for reviewing email correspondence in this case. (Filing No. 254-4 at 81-83) Fielder Law Firms' email system reveals that within Ms. McKibben's email account, she has 171 emails from Jocelyn Golden; 17 from Abigail Littrell; 23 from Tiffany Leasure, the City's paralegal; and 45 from Elizabeth Elliott. (Brandon Aff. at ¶17) Ms. McKibbin docketed all discovery deadlines; trial deadlines; prepared all notices of deposition in this case and amended notices of depositions; coordinated all deposition and trial subpoenas; worked substantial hours after close of business to assist counsel with the motion for summary judgment, including preparing the detailed indexes of evidence for all motion practice; and also was the primary paralegal responsible for trial exhibits. (*Id.*) Plaintiff's counsel is confident that the majority of Ms. McKibben's time was not billed in this case and no reduction should be ordered. (*Id.*)

19

Ms. McKibben has her bachelor's degree in criminal justice and has worked in the legal industry for 12 years. She was previously employed by the Honorable Joseph F. Bataillon of the United States District Court for the District of Nebraska as a Courtroom Deputy Clerk and/or Courtroom Deputy for ten years.  For the last six years, she has been employed as a paralegal in private practice. Her knowledge of the federal courts has been extremely valuable to Plaintiff. (Brandon Aff. At ¶ 18)

Robin Jahn has been a paralegal for 12 years and earned her paralegal certificate from Kaplan University.  (Brandon Aff. at ¶ 19)  She has substantial trial experience in terms of Plaintiff's software for exhibits.  (*Id.*) Her time assisting with trial preparation, as well as, her time at trial is critical in supporting Plaintiff's counsel during trial.  (*Id.*) With the number of exhibits in this matter, there is no way that Plaintiff's counsel could have manned the I-pad and software to properly display the exhibits necessary.

Donna Coltrane has been a paralegal for over thirty years and earned her paralegal certificate from the College of St. Mary.  (*Id.* at ¶ 20*)*  Cheryl Smith has been a legal assistant for six years.  The work that she billed in this case is not secretarial in nature as it involved trial exhibit work.  Ellen Kresha was a second and third-year law student at the University of Nebraska – Lincoln when she was employed by Fiedler & Timmer, P.L.L.C.  (Brandon Aff. at ¶ 21)  Samantha Robb will be entering her third year as a law student at Creighton University. (Brandon Aff. at ¶22)  Similarly, Ms. Costello served as a law clerk for Fiedler & Timmer, P.L.L.C. prior to joining the firm as an associate in the fall of 2017. (*Id.*)

Kathy Burt is the owner of Nebraska Paralegal Services, LLC.  Ms. Burt has been a paralegal for more than 25 years.  (Brandon Aff. at ¶23)  She worked for Kennedy, Holland, DeLacy & Svoboda through 2005; American Family Insurance as the in-house paralegal for the

state of Nebraska, which included in-depth case analysis and the preparation of case-defining

medical chronologies and case summaries. *(Id.)* Ms. Burt assisted us in preparing deposition

summaries for counsel to utilize to prepare for the trial of this matter of key witnesses. *(Id.)*

## IV.    EXPENSES BILLED BY PLAINTIFF'S COUNSEL ARE COMPENSABLE

### A.    EXPERT WITNESS FEES

"Reimbursement of expert fees are routinely approved by courts in the Eighth Circuit and

around the country as a component of attorney fees rather than costs." *Morales v. Farmland*

*Foods,* No. 8:08CV504, 2013 WL 1704722 (D. Neb. April 18, 2013) *citing, Lee–Thomas, Inc. v.*

*Hallmark Cards, Inc.,* 275 F.3d 702 (8th Cir.2002).

As stated above, even if Plaintiff had not intended on calling Oppenheimer, Bonta, and

McNeese, non-testifying and/or consulting experts and their fees are compensable. *Interfaith*

*Community Organization v. Honeywell Intern., Inc.,* 426 F.3d 694 (3rd Cir. 2005).

Plaintiff has provided Affidavits from Dr. Bonta, Dr. McNeese, Amy Oppenheimer, Dr.

Tellefsen, and Dr. Hannappel with their invoices attached for the Court's consideration. (Bonta

Aff., McNeese Aff., Oppenheimer Aff., Tellefsen Aff., and Hannappel Aff.)

### B.    MISCELLANEOUS EXPENSES

Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance

telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents

scanning, and visual equipment are typically recoverable. *Morales v. v. Farmland Foods,* No.

8:08CV504, 2013 WL 1704722 at *7). Plaintiff's meal expenses are compensable. *Argenyi v.*

*Creighton University,* No. 8:09CV341, 2014 WL 1838980 n. 9, *8 (D. Neb. May 8, 2014). Federal

fee-shifting statutes have always been interpreted "to allow recovery of 'reasonable out-of-pocket

expenses incurred by the attorney which are normally charged to a fee paying client' as attorney

fees." *Sturgill v. UPS, Inc.,* 512 F.3d 1024, 1036 (8th Cir. 2008).

The meal expenses incurred by Plaintiff's counsel are itemized by counsel on dates that depositions were taken or on the dates they were preparing for trial or in trial.  (Brandon Aff. at ¶32.[3]

Defendant claims that Plaintiff's mileage reimbursement requests should not be compensable because Plaintiff's counsel also billed their hourly rates during the travel.  Defendant cites no legal authority for this issue.  Mileage expense is compensable and routinely charged to clients.   Pacer, Justice and Westlaw Charges are also compensable.  TransUnion database is utilized by Plaintiff's counsel to  locate witnesses.  Westlaw was utilized and billed appropriately in this case.

Plaintiff's lodging was a necessity and actually saved the Defendant money.  The commute from Gretna to downtown Omaha during rush hour traffic would have necessitated Ms. Brandon and Ms. Fiedler's time at hourly rates.  (Costello Aff. at ¶¶7-8)  A night's hotel stay for counsel and staff in downtown Omaha was far less expensive than billing for hourly rates for the drive to and from Gretna.  Similarly, Defendant's counsel also stayed in downtown Omaha during trial. The nightly rates for Plaintiff's counsel's stay at the Doubletree Hotel ranged from $119/night to $189/night.  (Brandon  Aff. at ¶26)  The commute to downtown in rush hour traffic in my experience from Gretna to Omaha and/or from downtown to Gretna is at least 35 to 45 minutes. (Brandon Aff. at 26; Costello Aff. ¶7)  Even if it was only an hour, Ms. Fiedler, Ms. Jahn, and  Ms. Brandon's billing rate would be $865/hour.  Staying downtown was the least expensive and certainly the most productive option for this trial. (Brandon Aff. at ¶26)

---

[3]  Plaintiff will withdraw the meal at Stirnella for $136.77 as it is considerably larger than the other meal expenses.

## V.      CONCLUSION

Plaintiff respectfully requests that the Court order Defendant to pay the reasonable fees and expenses necessitated by their illegal conduct and requested herein.

TROY HURD, Plaintiff

By: /s/ Kelly K. Brandon
     Kelly K. Brandon, #20734
     FIEDLER LAW FIRM, P.L.C.
     20615 Highway 370
     Gretna, NE  68028
     (402) 316-3060
     (402) 513-6501 (F)
     kelly@employmentlawnebraska.com

Paige Fiedler, *Pro Hac Vice*
FIEDLER LAW FIRM, P.L.C.
8831 Windsor Parkway
Johnston, IA 50131
(515) 254-1999
(515) 254-9923
paige@employmentlawiowa.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 14th day of June, 2019 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all CM/ECF participants.

/s/ Kelly K. Brandon

23